**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Frederick Leon DOTSON, and Reginald Owens, Defendants-Appellants.**

No. 85–4952.

United States Court of Appeals, Fifth Circuit.

May 13, 1987.

Rehearing Denied July 1, 1987.

Robert Glass, New Orleans, La., for defendants-appellants.

John Hailman, Asst. U.S. Atty., Robert O. Whitwell, U.S. Atty., Oxford, Miss., for plaintiff-appellee.

Before RUBIN, RANDALL and JOHNSON, Circuit Judges.

RANDALL, Circuit Judge:

Defendants Frederick Leon Dotson and Reginald Owens appeal their convictions for conspiring to distribute cocaine and marijuana in violation of 21 U.S.C. § 846, and for distribution of and possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841. Dotson further appeals his conviction for willfully attempting to evade payment of federal income taxes in violation of 26 U.S.C. § 7201. We affirm the convictions entered by the district court.

I.

The Mississippi Bureau of Narcotics ("MBN") began in 1982 to investigate tips that defendant Dotson was running a marijuana selling operation. In 1983, the Bureau's suspicions were corroborated by the arrest and conviction of I.V. Young, later a government witness at Dotson's trial, who stated to police that he transported marijuana for Dotson and was carrying the fifty-three pounds of marijuana found in his vehicle in that capacity. Continuing its investigation, the MBN over the next two years infiltrated Dotson's operation with a number of informants and undercover agents who, posing as small-scale drug dealers, bought wholesale quantities of marijuana from Dotson. Information obtained in these undercover encounters indicated that defendant Owens had taken over Young's position as Dotson's "runner" after Young's conviction.

During this same period, the United States Internal Revenue Service ("IRS") investigated Dotson for tax evasion. Dotson, who claimed to run a construction and a real estate business, had neither an office, nor books or records, nor a telephone. In contrast to the prevailing poverty in the rural area in which he lived, Dotson owned two new Cadillacs, a new Lincoln Town Car, and a Rolls-Royce sedan, and had recently bought a Mercedes turbo-diesel sedan for his girlfriend.

Late in the summer of 1985, a grand jury returned a ten-count indictment against Dotson, including charges against Owens in four of the counts. The indictment charged Dotson and Owens with one count of conspiracy to distribute and possess with intent to distribute marijuana and cocaine,

and three counts of distribution of and possession with intent to distribute marijuana. In addition, Dotson was charged with two counts of willful evasion of federal income taxes, three additional counts of distribution of and possession with intent to distribute marijuana, and one count of possession of cocaine.

After a one-week trial, a jury returned a verdict that, on its face, convicted Dotson of all ten of the counts in the indictment. The jury convicted Owens of the conspiracy count and of one count of distribution of and possession with intent to distribute marijuana, but acquitted him on two counts of distribution of and possession with intent to distribute marijuana. The district court informally polled the jury and received in response a nodding of twelve heads. The court then discharged the jury.

Later that evening, the trial judge received a telephone call from two of the jurors. The jurors stated that, contrary to the verdict read in court, the jury had unanimously voted to acquit Dotson on count ten of the indictment. The judge then telephoned the foreman of the jury, who confirmed that this was the case. Based on the foreman's affidavit, the district court, acting *ex parte*, corrected the verdict to acquit Dotson on count ten. Post-trial motions for judgment of acquittal and for a new trial were denied, and this appeal followed.

On appeal, Dotson and Owens, represented by new counsel, raise four points of error. First, the defendants argue that the district court erred in changing the verdict *ex parte*. Citing Federal Rule of Criminal Procedure 31(d), defendants assert that the only proper course for the court to have taken would have been either to reconvene the jury for further deliberations or to order a new trial. Second, Dotson argues that Agent Baker, an expert witness whose testimony formed the basis of the government's tax evasion case, went beyond a mere summary of his testimony and impermissibly instructed the jury as to "whether the defendant did or did not have the mental state ... constituting an element of the crime charged." Fed.R.Evid. 704(b).

Third, Dotson challenges the district court's admission of a 2,000–word hearsay document as a prior consistent statement, despite the fact that only one or two sentences in the document supported the testimony earlier impeached. Fourth, Dotson and Owens attack the district court's denial of their motion to suppress certain evidence relevant to the conspiracy count as the fruit of an unreasonable search and seizure.

## II.

Defendants' attack on the district court's amendment of the jury verdict highlights a tension between the policies underlying Federal Rule of Criminal Procedure 31(d) and those underlying Federal Rule of Evidence 606(b). Defendants emphasize that, when a poll in open court reveals an inaccuracy in the jury's verdict, rule 31(d) provides two avenues by which the district court may permit the jury to resolve the discrepancy: the court may reconvene the jury for further deliberations, or it may order a new trial so that another jury may address the problems posed by the case. When the error in the verdict is discovered after the jury has been discharged, defendants argue, the policies of protecting the privacy of jury deliberations reflected in rule 606(b) prevent the district court from interrogating jurors as to their votes in an effort to piece together the true verdict. Since reconvening the jury is no longer possible, the court has no choice, according to rule 31(d), but to order a new trial, and the district court erred in refusing to do so.

The government responds that rule 31(d) is largely inapposite to the instant case, because the poll of the jury, such as it was, revealed no error in the verdict. To the contrary, the error was revealed well after the jury's discharge. Cases that address the problems of remedying a verdict discovered to be inadequate upon a poll in open court, the government asserts, are not relevant to the problems implicated here. Instead, rule 606(b)'s goal of ensuring the finality of verdicts prohibits, as a general rule, second thoughts, doubts, or vacillations of jurors from impeaching a verdict.

If there was error in the district court's amendment of the verdict, the government argues, the error favored the defendants and certainly does not warrant reversal.

We agree with the government that rule 31(d) does not provide much guidance in the instant case for two reasons. First, the purpose of rule 31(d) is to ensure the unanimity of jury verdicts. *See United States v. Edwards*, 469 F.2d 1362, 1366 (5th Cir. 1972). The record in this case does not indicate a lack of unanimity, but rather a unanimous jury whose opinion differed from that reflected in the written verdict. Second, the discrepancy *sub judice* was discovered after the district court's sketchy poll of the jury,[1] and, more important, after the jury was discharged. While the questions of remedying a problematic verdict like that in this case are, on their face, similar to those of resolving problems discovered during a routine jury poll, the propriety of amending a verdict after the jury is discharged must respond to powerful considerations of finality that are not in issue in a routine jury poll. As the legislative history of rule 606(b) indicates, "[p]ublic policy requires a finality to litigation." S.Rep.No. 1277, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin. News 7051, 7060. Moreover, "[j]urors will not be able to function effectively if their deliberations are to be scrutinized in post-trial litigation. In the interest of protecting the jury system and the citizens who make it work, rule 606 should not permit any inquiry into the internal deliberations of the jurors." *Id.* This case does not present a jury poll problem.

This circuit has recognized an exception to rule 606(b)'s general principle that juror testimony may not impeach a verdict in cases like that presently before us: "An affidavit of a juror is admissible to show that the verdict delivered was not that actually agreed upon ... but a juror may not subsequently impeach a verdict by stating how it was reached." *University Computing Co. v. Lykes-Youngstown*

*Corp.*, 504 F.2d 518, 547–48 n. 43 (5th Cir. 1974) (citing *Fox v. United States*, 417 F.2d 84, 89 (5th Cir.1969) ("It has long been well settled that the affidavit of a juror is admissible to show the true verdict or that no verdict was reached at all.")); *accord Smith v. City of Seven Points*, 608 F.Supp. 458, 462 (E.D.Tex.1985) ("Jurors may testify, however, to show that through inadvertence or mistake, the verdict actually entered differed from what the jury intended."). Our research indicates that cases to which this exception applies are few and far between. Nonetheless, courts have accepted that an appropriate means to remedy a clerical error in a verdict discovered by juror affidavits is to simply amend the verdict to reflect the intent of the jury, as the district court did here. *See Young v. United States*, 163 F.2d 187, 189–90 (10th Cir.) (rejecting defendants' demands for a new trial but implicitly agreeing that appropriate remedy would be "to have the causes remanded in order that the district court may reform the verdicts so that they will correctly express the agreement actually reached by the jury but incorrectly expressed in the verdicts as returned into open court and then enter new judgments upon the corrected verdicts."), *cert. denied*, 332 U.S. 770, 68 S.Ct. 83, 92 L.Ed. 355 (1947); *Freid v. McGrath*, 135 F.2d 833, 834 (D.C.Cir.1943) ("If the jury actually found a verdict in the amount of $850.00, but mistakenly apportioned that amount between two defendants, the District Court, if properly convinced of that fact, would have power to correct the verdict accordingly; so that it would express the conclusion actually reached, and finally agreed upon by the jury."); *Pelzer Mfg. Co. v. Hamburg-Bremen Fire Ins. Co.*, 71 F. 826, 834 (C.C.D.S.C.1896) (correcting error in jury verdict revealed by juror affidavits). We find no error in the district court's decision to correct the verdict rather than order a new trial.

---

1. Because the "right to poll the jury derives not from the Constitution, but from rule 31(d)," and because neither defendant objected to the trial judge's method of polling the jury, we find no reversible error in the court's demand for a nodding of heads. *United States v. Beldin*, 737 F.2d 450, 455 (5th Cir.), *cert. denied*, 469 U.S. 1075, 105 S.Ct. 572, 83 L.Ed.2d 512 (1984).

Defendants argue in the alternative that even if the district court properly amended the jury's verdict, it was nonetheless improper for the judge to have done so *ex parte,* off the record, and by communication with selected jurors. We agree that the district court more properly should have consulted counsel in deciding how to remedy the problem with the verdict. In the peculiar circumstances of this case, however, we do not find reversible error in the district court's acting *ex parte.* As the government points out, the court's action favored the defense, and the ultimate decision was for the district court in any case. While we recommend that, in the future, the district court handle novel problems with the advice and guidance of counsel, we find that the district court did not abuse its discretion in the instant case.

### III.

Dotson's second point of error questions the district court's admission of certain testimony of the government's tax expert, Agent Baker. Dotson complains that Baker went beyond a mere summary of the evidence adduced at trial that tended to show that Dotson had the requisite intent to evade payment of taxes. Baker's testimony, Dotson argues, instead impermissibly "state[d] an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged." Fed.R. Evid. 704(b). Dotson further argues that Baker, as a tax expert, was not qualified under Federal Rules of Evidence 701 or 702 to testify as to Dotson's state of mind.

The government responds, first, that defense counsel failed to preserve the error by objecting to the testimony at trial on the grounds asserted on appeal. The government then emphasizes the extreme technicality of proving tax evasion by the "net worth" method used at trial, and asserts that Baker's testimony was essential to guide the jury through the complexity of its case. Further, the government argues, Baker's testimony did not reach the ultimate issue of Dotson's state of mind, but merely highlighted the evidence that would support such an inference by the jury. Finally, the government points to expert testimony by Dotson's accountant on the question of Dotson's state of mind, implying that in any case Baker's testimony was permissible on a variation of the "opening the door" principle.

We strongly question whether defense counsel's objection at trial, even as interpreted by Dotson on appeal, was specific enough to preserve any error for review by this court. Dotson, adding the phrases bracketed below as the completion of an interrupted statement by defense counsel, would have us read the objection as follows:

Q. All right. Agent Baker, based on all of the testimony and the documents that you have reviewed and that were before the Court in this case, and based on your experience and expertise as an expert in this area, have you formed an opinion as to whether the various methods of attempted tax evasion used by the Defendant Dotson that are alleged in Counts 2 and 3, are those present, and if you will review as a summary witness what those different methods of attempting to evade taxes were, as you found them?

MR. DYER:

First of all, he has not said it is [his opinion], Your Honor. That is a presumption on the part of the questioner, and I would object to the form of the question. It [also] presupposes that his conclusion [is admissible under the rules].

MR. HAILMAN:

Your Honor, I believe he gave his opinion when we offered the summary into evidence.

THE COURT:

Objection overruled.

We question whether "[i]t presupposes that his conclusion [is admissible under the rules]" is specific enough to inform the trial judge of a ground on which the evidence might be excluded. *Cf. Nowell ex rel. Nowell v. Universal Elec. Co.,* 792 F.2d 1310, 1316 (5th Cir.) (objection that

jury instruction "'did not correctly state the law that would be applicable in this case'" failed to adequately particularize the error alleged and precluded appellate review "unless the error [was] so fundamental as to result in a miscarriage of justice."), *cert. denied*, —— U.S.——, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986). Out of an abundance of caution, however, we nonetheless address Dotson's contentions on the merits.

◼ We find no error in the district court's overruling Dotson's cryptic objection. As the legislative history of Federal Rule of Evidence 704(b) indicates:

> The purpose of this amendment is to eliminate the confusing spectacle of competing expert witnesses testifying to directly contradictory conclusions as to the ultimate legal issue to be found by the trier of fact. Under this proposal, *expert psychiatric testimony would be limited to presenting and explaining their diagnoses*, such as whether the defendant had a severe mental disease or defect and what the characteristics of such a disease or defect, if any, may have been.

S.Rep.No. 225, 98th Cong., 2d Sess. 230, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3412 (emphasis added). As the legislative history indicates, rule 704 prohibits experts from testifying as to the "ultimate legal issue"—whether the defendant did or did not have the requisite state of mind—yet permits experts to "present and explain" their diagnosis, that is, their analysis of the facts based on their special knowledge qualifying them as experts. Having carefully reviewed the excerpts from Baker's testimony in question here, we conclude that the record before us presents an instance where the expert's summary merely explained his analysis of the facts indicating willful evasion, and did not, perhaps with the exception noted below, directly embrace the ultimate question of whether Dotson did in fact intend to evade income taxes.

Several considerations support our conclusion that the testimony did not violate rule 704. First, the focus of the government's questions was on facts that might support the jury's acceptance of an inference of intent. For example, the following question is representative of the government's examination: "What other items have you noted in the evidence, Agent Baker, that indicate an intent willfully to evade income taxes?" Second, the responses of the expert were also focused on the evidence, rather than addressing the ultimate issue forbidden by rule 704.

The most borderline of the expert's statements reads as follows:

> In 1983, again, [Dotson's net worth] increased again forty thousand dollars, almost the same amount it did in 1981 through the period, so they are consecutive increases, which lead me to believe that Mr. Dotson's net worth and/or his equity was increasing through the period. This is indicative, and based on my experience shows to me, that he willfully and intentionally increased his income knowing full well that he had not reported the taxes due thereon.

The second sentence in the above excerpt can be interpreted in two ways. Interpreting the sentence more favorably to the government, the sentence simply ties the facts recited in the first sentence to the conclusion that the expert, based on his specialized experience, believes they indicate. Interpreting the sentence more favorably to the defendant, the sentence presents an instance in which the expert draws the forbidden conclusion that the defendant "willfully and intentionally" evaded income taxes.

Although the above excerpt is indeed on the borderline between a summary and a conclusion on the ultimate issue, we find that the district court did not abuse its discretion in permitting the testimony. Dotson did not bring the statement to the attention of the district court by renewing his objection, and we believe that, viewed in the context of that otherwise straightforward portion of Baker's examination, the first interpretion of the sentence is the more reasonable. We find no error in district court's admission of Baker's summary of the evidence supporting the government's tax evasion case.

## IV.

Dotson's third point of error challenges the district court's admission of a lengthy hearsay document into evidence as a prior consistent statement. The government's witness, I.V. Young, testified that he was a "runner" for Dotson before his arrest and conviction for possession with intent to distribute marijuana. Young testified that when he was working for Dotson he carried packages of marijuana for Dotson from Florida at least once a week for several months, which added up to about twenty-two deliveries. On cross-examination, defense counsel confronted Young with his testimony before the grand jury that indicted Dotson, where Young had testified that he had carried marijuana for Dotson only three or four times before he was arrested. To reaffirm the credibility of Young's testimony on direct, the government called MBN Agent Anderson, to whom Young had given a statement upon his arrest. Agent Anderson testified that Young had at that time told her that he was making "runs" to Florida sometimes two or three times a week during the period in question. The government then introduced into evidence, over Dotson's hearsay objection, Anderson's report of her interview with Young. The report did contain a statement consistent with Young's testimony at trial, but it also contained a number of damaging statements about the work Young did for Dotson.

Dotson first argues that, even if the statement in Anderson's report of her interview with Young is arguably consistent with a statement by Young impeached at trial, its recitation in a hearsay document disqualifies it under the hearsay-within-hearsay principle of Federal Rule of Evidence 805. Since Anderson's report is an out-of-court, unsworn statement, it constitutes a hearsay document not qualifying under any of the hearsay exceptions and therefore must be excluded. Dotson further argues that, even if the one sentence in the report that is consistent with Young's impeached testimony was admissible, the rest of that lengthy and damaging document certainly was not.

The government responds that the case law demonstrates that prior consistent statements are often introduced through the testimony of third-party witnesses; the fact that the statement was admitted through the testimony and report of Agent Anderson is immaterial. The government further argues that if Dotson wanted to have excised those parts of the document that were not relevant to the testimony of Young that was impeached, it was Dotson's responsibility to request the district court to do so. Finally, the availability of both Young and Anderson for further cross-examination ensured Dotson the opportunity to confront any accusations contained in the report should he have so desired.

■ We begin by noting that the district court is endowed with "broad discretion with respect to the admission of" prior consistent statements. *United States v. Goodson*, 502 F.2d 1303, 1307 (5th Cir. 1974). We find no abuse of discretion here. Dotson's objection that the report constituted "hearsay within hearsay" is misplaced. According to the terms of rule 801(d)(1), prior consistent statements are not hearsay; the hearsay-within-hearsay principle contained in rule 805 simply does not apply to prior consistent statements. Moreover, the statement in the report does not constitute a hearsay statement in any case, because it was not offered into evidence to prove the truth of the matter asserted but to shore up the impeached credibility of Young's testimony. *Cf. United States v. Williams*, 573 F.2d 284, 289 (5th Cir.1978) ("Usually a prior consistent statement is not admissible because mere repetition does not enhance the veracity of the statement. However, prior statements have traditionally been admissible to reestablish the credibility of a witness who has been impeached."). Further, at least one court has not hesitated to accept the admission of a prior consistent statement made to a police officer. *See Keeney v. Lewis Revels Rare Coins, Inc.*, 741 F.2d 378, 383 (11th Cir. 1984). We find that the prior consistent statement contained in the report was admissible.

As for Dotson's complaint that the report contained damaging information not pertinent to Young's impeached credibility at trial, we agree with the Eleventh Circuit that, when a party does not request excision of prejudicial portions of a document admissible as a prior consistent statement, the district court does not abuse its discretion in refraining from excising those portions on its own motion. *United States v. Brantley,* 733 F.2d 1429, 1438 (11th Cir. 1984), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985).

## V.

Defendants' final point of error questions the district court's decision to admit evidence seized from the trunk of a car driven by Owens and, for all practical purposes, owned by Dotson. According to Owens, Dotson had lent him the car so that Owens could wash and clean it. Driving toward his girlfriend's house after running some personal errands, Owens was stopped by a highway patrolman for exceeding the speed limit by three miles per hour. The officer asked Owens whether he could look in the trunk of the car, and Owens initially refused, stating that the car was not his and a search warrant was required. Eventually, and it is unclear what role Owens's consent played in permitting the search, the officer was able to look inside the trunk. He found a quantity of marijuana shavings on the trunk's carpet and a paper bag containing $90,000. The government sought to introduce testimony about the $90,000 at trial.

Both defendants moved to suppress the evidence as the fruit of an unreasonable search and seizure. After an evidentiary hearing, the district court denied both motions. As to Owens's motion, the court noted that "[d]uring argument counsel for

defendant Owens admitted that, based upon Owens' own testimony, he had no expectation of privacy in the vehicle or its contents and therefor [sic] lacked standing to raise the issue and withdrew his motion to suppress." *United States v. Dotson,* No. CRG85–47–NB, order at 1–2 (N.D.Miss. Oct. 16, 1985) (order and memorandum denying motions to suppress and for severance). Based on our review of the record, we do not find that the district court erroneously interpreted the representations of Owens or his counsel, and therefore review only the denial of Dotson's motion to suppress.[2]

The district court found that Dotson did not have "standing" to protest the search of the trunk. First, the court noted that Dotson was not the legal owner of the car, since title was registered in the name of his sister. The court then held that Dotson did not have a reasonable expectation of privacy in the money found in the car's trunk: "No one in his right mind who intended to retain a privacy interest in such a large amount of cash would ever have simply turned it over to a third party, in the trunk of a car belonging to yet another party, without informing anyone that the money was there and that the person driving the car was responsible for it." *Id.* at 2–3.

Dotson argues that the uncontradicted testimony at the hearing indicated that he had been in lawful possession of the car for over a month, and for all practical purposes during this time, it was his car. As such, Dotson therefore had "a property [or] possessory interest in the automobile" sufficient to create a reasonable expectation of privacy in the vehicle. *Rakas v. Illinois,* 439 U.S. 128, 148, 99 S.Ct. 421, 432–33, 58 L.Ed.2d 387 (1978). Dotson argues that there is, in the American citizen, a reasonable expectation of privacy in the trunk of

---

2. During oral argument on the motion to suppress, trial counsel for Owens responded to questioning by the district court as follows:

THE COURT: I am just posing [my question] in the narrow confines of whether your client had any expectations of privacy in that trunk.

MR. HOLLOWELL [trial counsel for Owens]: No, sir. I do not believe in all honesty that I can say he did.

THE COURT: All right. Anything further? Having carefully considered the above excerpt in the context from which it was taken, we believe that a reasonable district judge would have interpreted trial counsel's statement as a concession on the key point of inquiry.

a car when it is temporarily entrusted to a friend.

The government responds, first, that the evidence in question was relevant only to the conspiracy count, and such evidence constituted only a small part of the evidence introduced to support the government's conspiracy case. Thus, any error in denying the motions was at any rate harmless. Second, the government argues that Dotson did not have a reasonable expectation of privacy in the trunk of the car because he did not possess the vehicle.

■ We find that Dotson did have a reasonable expectation of privacy in the car's trunk. As the Supreme Court has noted, concepts of property law do not control fourth amendment jurisprudence. *Rakas,* 439 U.S. at 143, 99 S.Ct. at 430. Instead, the inquiry is whether the defendant had a legitimate expectation of privacy in the area searched. *See id.,* at 148, 99 S.Ct. at 432–433. Thus, the fact that Dotson was not the legal owner of the car, while certainly an important consideration in the court's fourth amendment analysis, is not dispositive of the question. As the legitimate possessor of the car for an extended period of time, Dotson held a "property [or] a possessory interest in the automobile" sufficient to constitute "an interest of the defendant which the Fourth Amendment was designed to protect." *Id.* at 140, 148, 99 S.Ct. at 428–29, 432–33; *cf. United States v. Martinez,* 808 F.2d 1050, 1056 (5th Cir.1987) (court was "satisfied that, as lawful possessor of the car, Martinez has standing to challenge the search."). Given the limited nature of the bailment of the car to Owens, we find that Dotson did not give up his expectation of privacy in the car by his temporary loan of the vehicle. *See also* W.R. LaFave, 4 *Search and Seizure* 332 (2d ed. 1987) ("It is doubtless true that where .... the owner was only 'temporarily out of possession of the car at the time of the search' because 'the bailment was to be of short duration,' it 'would be hyper-technical to say that he lacked a sufficient interest in his own car' to challenge a search of it during the bailment.") (quoting *United States v. Eldridge,* 302 F.2d 463

(4th Cir.1962)). In short, we hold that when a citizen loans his car to a friend for a limited period of time, the *de facto* owner or lawful possessor does not thereby lose his reasonable expectation of privacy in the vehicle. The district court erred in finding that Dotson lacked "standing" to challenge the search of the automobile.

■ Our inquiry does not end here, however. A constitutional error may be found harmless if "the beneficiary of a constitutional error ... prove[s] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The question is not "whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of"; rather, "[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–31, 11 L.Ed.2d 171 (1963). We find that, in view of the overwhelming evidence demonstrating that Dotson conspired to distribute and to possess with intent to distribute marijuana, there was not a reasonable possibility that the money and marijuana shavings found in the trunk contributed to his conviction.

First, as previously noted, I.V. Young testified that he had acted as a marijuana "runner" for Dotson during several months, and in this period carried marijuana for Dotson many times. Second, Dotson told MBN Agent O'Neal that his brother "handled his marijuana for him," telephoned his brother to meet the agent, and then, in the agent's presence, directed the brother to sell O'Neal a half-pound of marijuana. Third, an undercover DEA operative testified that he asked Dotson to sell him three pounds of marijuana. Dotson pointed to Owens and said that "he would take care of you." Owens then put three pounds of marijuana in the operative's car. Claiming to be unsure of the price, the operative returned to Dotson and asked if $1,800 was the correct price for three pounds, and Dotson verified the price.

Fourth, in another transaction, the operative paid Dotson for a package of marijuana whereupon Dotson motioned the operative outside to where Owens was seated in a car. The operative entered the vehicle, Owens asked if he had already paid and then gave the operative the marijuana. Fifth, Donna Dixon, Dotson's former girlfriend, described in detail how Owens and Dotson planned, transported, weighed, stored, and delivered marijuana for sale over a period of years. On this record, we find that the government has shown beyond any reasonable doubt that the error in admitting evidence of the search of the car did not contribute to the verdict.

### VI.

For the foregoing reasons, the convictions of Dotson and Owens are AFFIRMED.