(2) for a single, adult person, not otherwise entitled to a homestead, not more than 100 acres....

Moody insists that he is entitled to a 200–acre homestead exemption notwithstanding the fact that he is a single adult and his property is rural, because the Texas Constitution trumps the Texas Property Code. He argues that a later constitutional provision should control an earlier legislative enactment, and the constitutional provision was ratified in November 1973, while the statute was signed into law the previous June. For this reason, the inclusion of the homestead exemption in the constitution manifests an intent to safeguard the homestead by putting it beyond the reach of legislators.

The Texas constitutional and statutory provisions need not be read as inconsistent, however. The legislature must have perceived no conflict between the two, because the statute and the constitutional amendment were passed concurrently in May 1973. The statute did not become effective until after the ratification of the constitutional amendment. The Texas Constitution is logically viewed as an enabling act, with the statute as its implementation, focusing on the Constitution's words "not more than 200 acres."

■ The district court regarded Moody's argument that he was entitled to a 200–acre homestead as an equal protection challenge, but declined to strike down the Texas Property Code provision because it distinguished between married and single people. The court concluded that Moody was entitled to only the single person homestead of 100 acres under the Texas Property Code because "well established principles of judicial restraint militate against federal court intervention in state legislation absent evidence of violations that reach constitutional magnitude."

The distinction between single adults and heads of families for purposes of the homestead exemption plainly has a rational basis, and the court did not err in refusing to interfere with the explicit provisions of the Texas Property Code, given that there is no direct conflict between those provisions and the Texas Constitution.

## IV

The district court did not err in finding that Moody's homestead rights were never extinguished as a result of the many and varied fraudulent paper conveyances he made in anticipation of bankruptcy. So long as a debtor has no actual intent to abandon his or her homestead rights, conveyances which are otherwise void do not extinguish those rights.

Nor did the district court err in finding that Moody's land was rural rather than urban and applying the Texas Property Code to limit Moody's rural homestead exemption to 100 acres. Accordingly, the judgment of the district court is AFFIRMED.

**Joanne ROBLES, Plaintiff–Appellee,**

v.

**EXXON CORPORATION, Defendant–Appellant.**

No. 88–2590
**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Jan. 12, 1989.

Michael D. Jones, Deborah L. Weimers, Houston, Tex., for defendant-appellant.

Roland B. Darby, Houston, Tex., for plaintiff-appellee.

Before POLITZ, KING and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

This is a tale of two verdicts. The district court refused to enter judgment for the defendant, Exxon Corporation ("Exxon"), on the first verdict on the ground that juror testimony, received after the jury had rendered its verdict, indicated that the jury's answers to two special interrogatories were the result of the jury's failure to understand the court's instructions. Instead, the court ordered the jury to resume its deliberations. After the jury returned a second verdict, this time in favor of the plaintiff, Joanne Robles, the court entered judgment for her. Because we conclude that the district court erred by (1) refusing to enter judgment on the first verdict and (2) hearing the jurors' post-verdict testimony regarding their thought processes, we reverse and render.

I.

The relevant facts are not in dispute. Robles sued Exxon for injuries suffered when she slipped and fell at one of Exxon's service stations. After both parties had presented their evidence, the district court, without objection from either party, instructed the jury on Robles' negligence claim. In accordance with Texas law,[1] the

---

1. Under Tex.Civ.Prac. & Rem.Code § 33.001(a)   (Vernon Supp.1989),

district court twice specifically told the jury that if it found that Robles, on account of her own negligence, was more than 50% responsible for her injuries, she would be barred from recovering any damages from Exxon.[2]

The district court then gave the jury six special interrogatories. The first four interrogatories asked whether (1) Exxon was negligent; (2) Exxon's negligence was a proximate cause of Robles's injuries; (3) Robles was negligent; and (4) Robles's negligence was a cause of her injuries. In Interrogatory No. 5, the jury was requested to write down the parties' relative percentages of fault, with Robles's percentage to be entered on line (a) and Exxon's on line (b). After reading Interrogatory No. 5 to the jury, the court specifically instructed the jury that

> [i]f you answer 5(a) [regarding Robles' percentage of fault] in the percentage of 50 percent or less, answer special interrogatory number 6. Otherwise, do not answer special interrogatory number 6.

Finally, Interrogatory No. 6 asked the jury to determine the sum of money that would compensate Robles for her injuries. The special interrogatory form in hand, the jury retired to deliberate.

When the jury returned, the jury forewoman indicated that the jury had unanimously answered all of the questions which it cared to answer. Upon inquiry from the court, all of the jurors nodded their heads in agreement. The jury's answers to the special interrogatories indicated that it found that both Exxon and Robles were negligent, and that each party's negligence was a proximate cause of Robles's injuries. In response to Interrogatory No. 5, the jury found Robles 51% responsible for her injuries and Exxon only 49% responsible. In accordance with its instructions, the jury did not answer Interrogatory No. 6 regarding damages. Upon receiving this verdict, the court, before discharging the jury, observed that the jury's verdict meant that Robles would take nothing.

After discharging the jury, the judge retired with counsel to chambers. After a few moments, a marshal informed the judge that the jury forewoman thought that there was a "misunderstanding."

The court called the jurors back into the courtroom, and proceeded to elicit unsworn testimony from them regarding this "misunderstanding." The gist of their responses was that they understood the court's instructions to mean that if they found Robles more than 50% negligent, the judge, instead of the jury, would determine and award damages. According to one juror, the jury was unable to "come up with a reasonable amount to reward [Robles] with," although it "wanted to give her some money"; it understood, however, that "if we couldn't decide [on an award] and if [the answer to Interrogatory No. 5(a)] were 51 percent or more, that you would

[i]n an action to recover damages for negligence resulting in personal injury ... a claimant may recover damages only if his percentage of responsibility is less than or equal to 50 percent.

Section 33.012(a) in turn provides that

[i]f the claimant is not barred from recovery under Section 33.001, the court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's percentage of responsibility.

**2.** The court's charge read, in pertinent part:

If you find that a preponderance of the evidence supports the plaintiff's claim, and if you find in favor of the defendants [sic] on its defenses, this will not prevent recovery by the plaintiff. It only reduces the amount of plaintiff's recovery, unless you find plaintiff was more than 50 percent responsible for her own

damages. In other words, if you find that the accident was done partly—let me read that again.

In other words, if you find that the accident was due partly to the fault of the plaintiff, that her own negligence was, for example, 10 percent responsible for her own damage, then you will fill in that percentage as your finding on the special verdicts I will explain to you in a moment. Such a finding, unless greater than 50 percent, will not prevent the plaintiff from recovering. The court will merely reduce the plaintiff's total damages by the percentage you insert.

Neither party objected to these instructions as being confusing or otherwise incorrect at the time they were given. Indeed, when the district court asked the jury to resume its deliberations, it was content to send the jury back to the jury room without expanding upon or even rereading its instructions from the day before.

decide from the bench whether she should be rewarded."

Although it noted that "[o]n the face of [the verdict] there is no conflict on the answers," the court decided that the jury had clearly misunderstood its instructions. Over the objection of Exxon's counsel, it instructed the jury to return and resume its deliberations the following morning. After such further deliberations, the jury found Robles to be 49% at fault and Exxon 51% at fault, and assessed damages in the amount of $85,450.00. The court accepted the verdict and entered judgment for Robles in the amount of $43,579.50 (51% of $85,450.00). Exxon appeals, arguing that the district court erred by denying its motion for judgment on the first verdict.

## II.

██ Rule 58(2) of the Federal Rules of Civil Procedure provides that

upon a special verdict or a general verdict accompanied by answers to interrogatories, the court shall promptly approve the form of the judgment, and the clerk shall thereupon enter it.

Although the court may resubmit special interrogatories to a jury prior to discharge if the jury's original answers to the interrogatories are irreconcilably inconsistent,[3] rule 58(2) and the seventh amendment command that judgment be entered on the verdict if the jury's answers are clear and consistent, subject, of course, to the usual motions under rules 50 and 59 for judgment notwithstanding the verdict or a new trial. *See Nance,* 817 F.2d at 1178; *Griffin v. Matherne,* 471 F.2d 911, 915 (5th Cir.1973) ("The Seventh Amendment requires that if there is a view of the case which makes the jury's answers consistent, the court must adopt that view and enter judgment accordingly."); 6A J. Moore, J. Lucas, & G. Grotheer, Moore's Federal Practice ¶ 58.04[3] at 58–42 (2d ed. 1984) ("By returning a special verdict the jury has found the facts and it then becomes the duty of the court to apply the law to those

facts and render judgment" (footnote omitted)).

██ As the district court itself correctly noted, there are simply no inconsistencies to be found in the jury's first set of answers to the special interrogatories. The jury found—by its own indication, unanimously—that both parties were negligent, that both parties' negligence was the proximate cause of Robles's injuries, and that Robles was 51% responsible and Exxon 49% responsible. As it was instructed, the jury did not answer the last interrogatory on damages, as it had already found Robles more than 50% at fault. From the face of the special verdict form, there is no indication that the jury did anything other than follow its instructions to the letter and answer the special interrogatories, which were put to it in a clear and consistent manner. Under rule 58, therefore, the district court should have entered a judgment on the verdict in favor of Exxon.

## III.

██ The district court concluded, however, that resubmission of the interrogatories to the jury even after it was discharged was nonetheless proper because the post-verdict testimony from the jurors indicated that "[e]ach juror misunderstood the effect of his or her responses to Special Interrogatories 5 and 6." Although we acknowledge the district court's good intentions, we are compelled to disagree, because the method by which the court ascertained that the jury had misunderstood its instructions—receiving testimony from the jurors themselves after they had returned their verdict—is without question prohibited by the Federal Rules of Evidence.

Rule 606(b) provides that

[u]pon an inquiry into the validity of a verdict ... a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as

---

3.  *See Nance v. Gulf Oil Corp.,* 817 F.2d 1176, 1178 (5th Cir.1987); *Guidry v. Kem Mfg. Co.,* 604 F.2d 320, 321 (5th Cir.1979), *cert. denied,*

445 U.S. 929, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980).

influencing the juror to assent to or dissent from the verdict ... or concerning the juror's mental processes in connection therewith....[4]

As the Advisory Committee's notes accompanying the rule indicate, the "central focus" of the federal decisions on which the rule is based has been to "insulat[e] ... the manner in which the jury reached the verdict, ... including arguments, statements, discussions, mental and emotional reactions, votes, and any other feature of the process." The Committee specifically mentioned with approval that courts have held jurors incompetent to testify as to whether they or other jurors misinterpreted their instructions. *See id.* (citing *Farmers Coop. Elevator Ass'n v. Strand*, 382 F.2d 224, 230 (8th Cir.), *cert. denied*, 389 U.S. 1014, 88 S.Ct. 589, 19 L.Ed.2d 659 (1967)).

Moreover, the legislative history of the rule unmistakably points to the conclusion that Congress made a conscious decision to disallow juror testimony as to the jurors' mental processes or fidelity to the court's instructions. *See generally Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739, 2748–50, 97 L.Ed.2d 90 (1987). After the Supreme Court adopted the present version of rule 606(b) and transmitted it to Congress, the House Judiciary Committee, noting the restrictive scope of the proposed rule, rejected it in favor of a broader formulation that would have allowed juror testimony on "objective jury misconduct" occurring at any point during the trial or the jury's deliberations. *See H.R.Rep. No. 93–650*, 93d Cong., 2d Sess. 9–10 (1973), *reprinted in* 1974 U.S.Code Cong. & Admin.News 7051, 7083. The Senate Judiciary Committee did not disagree with the House Judiciary Committee's interpretation of the rule proposed by the Court, but it left no uncertainty as to its view of the effects or wisdom of the House's proposed rule:

Although forbidding the impeachment of verdicts by inquiry into the jurors' mental processes, [the House's proposed rule] deletes from the Supreme Court version the proscription against testimony 'as to any matter or statement occurring during the course of the jury's deliberations.' This deletion would have the effect of opening verdicts up to challenge on the basis of what happened during the jury's internal deliberations, *for example, where a juror alleged that the jury refused to follow the trial judge's instructions....*

Permitting an individual to attack a jury verdict based upon the jury's internal deliberations has long been recognized as unwise by the Supreme Court....

....

Public policy requires a finality to litigation. And common fairness requires that absolute privacy be preserved for jurors to engage in the full and free debate necessary to the attainment of just verdicts. Jurors will not be able to function effectively if their deliberations are to be scrutinized in post-trial litigation. In the interests of protecting the jury system and the citizens who make it work, rule 606 should not permit any inquiry into the internal deliberations of the jurors.

S.Rep. No. 93–1277, 93d Cong., 2d Sess. 13–14 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 7060 (emphasis added). When the competing versions of rule 606(b) went to the Conference Committee, the Committee adopted, and Congress enacted, the version of rule 606(b) originally proposed by the Court and preferred by the Senate.

Our previous cases have been faithful to the text and legislative intent of the rule as enacted by Congress. In *Peveto v. Sears, Roebuck & Co.*, 807 F.2d 486 (5th Cir.1987), we held that rule 606(b) forbade the consid-

---

**4.** The rule goes on to provide an exception to the general prohibition against juror testimony for testimony relating to "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." Fed.R.Evid. 606(b). *See, e.g., Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1143–47 (5th Cir.1988) (attempted bribery of jury). Robles does not contend that either exception is applicable to the case at bar.

eration of juror testimony regarding possible confusion on the part of the jury as to the meaning of their instructions. In *Peveto*, a case involving claims under the Texas wrongful death and survival statutes, the jury was asked to answer special interrogatories regarding the comparative fault of the parties and actual damages. At several points during the deliberations, the jury asked the court to reinstruct it regarding the effect of its answers to the comparative fault questions on the amount, if any, which the plaintiffs would recover. After having been reinstructed, the jury finally returned a verdict in which it found that the defendants were only 4% responsible for the decedent's death, with the decedent himself being 96% responsible. It also found actual damages in the amount of $100,000. After polling the jury to ensure that all jurors concurred in these figures, the court entered judgment in favor of the plaintiffs for $4,000 (4% of $100,000). *See id.* at 487–88.

Some time after the jury had been discharged, the plaintiffs' counsel sought out individual jurors and discovered that at least four of the six jurors had misunderstood their instructions and had reduced the $2,500,000 damage award requested by the plaintiffs by 96% to arrive at $100,000. The two other jurors stood by the verdict as announced. The plaintiffs' counsel sought and received a hearing on juror confusion at which all six jurors testified, but the court, although acknowledging that

the jurors were "obviously" confused, refused to amend or alter the judgment to reflect what the plaintiffs termed the jury's "true verdict." *See id.* at 488.

We affirmed on the ground that the only evidence of juror confusion—the jurors' own testimony—was barred from consideration by rule 606(b). In rejecting the plaintiffs' argument that the court's erroneous or confusing instructions on comparative fault misled or confused the jury and thus were an "outside influence improperly brought to bear" upon the jurors, Judge Rubin wrote:

> If the court gives jurors erroneous instructions on the law in the course of normal judicial proceedings, other means of correcting discernible error are available without inquiring into the jurors' mental processes. *Of course, in the jury trial process there is always some danger that jurors will misunderstand the law* or consider improper factors in reaching their verdict, *but, by implementing Rule 606(b), Congress has made the policy decision that the social costs of such error are outweighed* by the need for finality to litigation, to protect jurors from harassment after a verdict is rendered, and to prevent the possible exploitation of disgruntled ex-jurors.

*Id.* at 489 (emphasis added).[5] *See also Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 602 n. 30 (5th Cir.) ("Whether or not

5. Our holding in *Peveto* stands in stark contrast to the result reached by another circuit in a factually similar case, *Attridge v. Cencorp Div. of Dover Technologies Int'l, Inc.,* 836 F.2d 113 (2d Cir.1987), on which the district court below relied heavily. In *Attridge,* a comparative negligence case submitted to the jury on special interrogatories, the court held that rule 606(b) did not bar post-verdict juror testimony to the effect that the jury had already factored percentages in calculating the amount which it entered as the amount of damages. Deeming the case as involving the "correct[ion of a] mistaken transmission of the verdict from the jury," *Attridge* held that the juror testimony was admissible because it was "intended to resolve doubts regarding the accuracy of the verdict announced, and not to question the process by which those verdicts were reached." *Id.* at 117.

Admittedly, the fact that the jurors in *Attridge* were unanimous in insisting that an error had

occurred made it easier for that court to characterize the case as involving a "mistaken transmission" of a verdict rather than one involving jury misinterpretation of its instructions. Our holding in *Peveto,* however, was in no way based upon the fact that the jury in that case was not unanimous in believing that a mistake had been made. Rather, we held that because the only evidence that the jury was "confused"— in the same manner that the *Attridge* jury was "confused"—as to the meaning or application of their instructions necessarily went to the jury's "mental processes," it was forbidden by rule 606(b).

In our view, therefore, *Peveto* and *Attridge* are irreconcilable. Because *Peveto* is controlling, however, and because the district court's attempts to distinguish the two cases are unavailing, the district court erred by following the holding of another circuit in preference to our previous decision.

the jury misunderstood the charge of the court is not a question to be reexamined after the verdict has been rendered."), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974).[6] "[I]t is a peculiar facet of the jury institution that once a verdict is rendered, no judicial inquiry is permitted into the jury's deliberative process to determine if in fact the court's instructions were properly followed." *United States v. D'Angelo,* 598 F.2d 1002, 1004 (5th Cir.1979).

The fact that the jury in this case, in addition to having already rendered its verdict (which alone would trigger the application of rule 606(b)), had been discharged when the jurors' testimony was adduced is of critical importance.

The restrictions in Rule 606(b) apply only to inquiry after the verdict or indictment has been reached.... As Wigmore states:

> The reasons for the foregoing rule, namely, the dangers of uncertainty and of tampering with the jurors to procure testimony, disappear in large part if such investigation as may be desired is *made by the judge* and ... takes place *before the jurors' discharge* and separation.

6 J. Weinstein & M. Berger, Weinstein's Evidence (hereinafter "Weinstein") ¶ 606[04] at 606–30 through 606–31 (1987) (quoting 8 J. Wigmore, Evidence § 2350 at 691 (McNaughton rev. 1961)) (emphasis in Wigmore).[7]

The district court was correct when it noted that we have held that rule 606(b) does not bar juror testimony as to whether the verdict delivered in open court was actually that agreed upon by the jury. *See United States v. Dotson,* 817 F.2d 1127, 1130 (5th Cir.), *modified on rehearing,* 821 F.2d 1034 (5th Cir.1987); *University Computing Co. v. Lykes–Youngstown Corp.,* 504 F.2d 518, 547–48 n. 43 (5th Cir.1974). These holdings simply embody the sound reasoning that such inquiries are not directed at the "validity" of the verdict and thus are not covered by the rule.[8] In *Dotson,*

---

6. In its memorandum opinion and order, the district court attempted to distinguish *Peveto* and *Smallwood* on the grounds that (1) not all of the jurors in those cases indicated that they had misunderstood their instructions, and (2) the jurors in those cases did not indicate that they had been confused until some time had passed after the juries had been discharged. We find these distinctions unpersuasive.

Nothing in *Peveto* or *Smallwood* indicates that the decisions in these cases turned on the fact that every juror may not have been confused or that the jury had not been "tainted" in the time period after discharge; moreover, whether the categorical rule created by rule 606(b) applies to a given case simply does not turn on whether one, two, or all of the jurors indicate that they may have been confused or on when or how, after they have rendered their verdict, the jurors evidence their confusion. Rather, the applicability of rule 606(b) is determined solely by the nature of the testimony sought to be introduced: If the juror's testimony "[u]pon an inquiry into the validity of a verdict" goes to any "matter or statement" occurring during deliberations, anything "influencing the juror to assent to or dissent from the verdict," or anything "concerning the juror's mental processes," it is deemed incompetent and inadmissible unless it fits within the narrow class of exceptions outlined in the rule itself.

7. We note, as well, that although here the inquiry was made by the judge, there is, in any

case, the undesirable possibility that once a verdict has been announced, the judge's reaction to it, despite the best of intentions, can have an improper influence on jurors if the verdict is to be reopened, as it was here:

> [T]he trial judge is a potent figure indeed. His instructions are lethal. He can communicate his attitude in a thousand ways from a cocked eyebrow to a sideways glance. Those will not be of record. They are not reviewable. Trial judges are disciplined ultimately only by their good faith and integrity and by an occasional reminder from their appellate brethren to be constantly vigilant of their power.

*Perricone v. Kansas City S. Ry.,* 704 F.2d 1376, 1378–79 (5th Cir.1983).

8. Thus, "Rule 606(b) would not bar testimony by a juror that all the jurors agree that through inadvertence, oversight or mistake the verdict announced was not the verdict on which agreement had been reached." 6 Weinstein ¶ 606[04] at 606–40 (footnote omitted). The critical distinction is well exemplified by *McNulty v. Borden, Inc.,* 542 F.Supp. 655, 657 (E.D.Pa.1982). There, a juror's affidavit was introduced to show that the jury believed that it was finding for the plaintiff and would have answered an interrogatory differently had it known the effect of its answer on the ultimate result. Where it was clear that the jurors had "agreed that the answer was 'No', and that was the answer given in Court ...[,] whatever 'mistake' the jury might

we noted that the admission of such testimony was proper to investigate the possibility of "a clerical error in a verdict," not its "validity" in the sense of being correct or proper, and that the cases to which this exception would apply are "few and far between." 817 F.2d at 1130.[9]

This is not such a case. The error here is not "clerical," as would be the case where the jury foreperson wrote down, in response to an interrogatory, a number different from that agreed upon by the jury, or mistakenly stated that the defendant was "guilty" when the jury had actually agreed that the defendant was not guilty. Rather, the error alleged here goes to the substance of what the jury was asked to decide, necessarily implicating the jury's mental processes insofar as it questions the jury's understanding of the court's instructions and application of those instructions to the facts of the case.[10]

The testimony from one of the jurors, for example, makes this point painfully obvious. Juror Nicholas testified that the jury

understood the court's instructions to mean that "if we couldn't decide [on an award] and if it [i.e., the percentage of fault attributable to Robles] were 51 percent or more, that you would decide from the bench whether she should be rewarded." The testimony on its face violates rule 606(b) because it relates to how the jury interpreted, or as juror Nicholas put it, "misinterpretated," the court's instructions, and thus unquestionably constitutes testimony as to a "juror's mental processes" that is forbidden by the rule.[11] In short, therefore, rule 606(b) operates in cases such as this to "[e]xclude[ ] ... testimony that a juror ... was confused about the legal significance of the jury's answers to special interrogatories...." 6 Weinstein ¶ 606[04] at 606-33 through 606-35 (footnotes omitted).

We thus conclude that the only evidence that the jury misunderstood its instructions is deemed incompetent and inadmissible by rule 606(b), and should not have been heard

---

have made is not one it can now correct by testimony." *Id.*

**9.** Reading *Dotson* in conjunction with *Peveto* reveals the narrowness of the "clerical error" exception. As in *Attridge*, the jury error in *Peveto* could have been characterized as one involving the "transmission" of the verdict, insofar as it involved only erroneously-undertaken calculations, and thus as "clerical" or ministerial in nature. As noted above, however, we did not adopt this characterization. The category of "clerical" errors described in *Dotson*, therefore, can be understood to refer only to discrepancies between the verdict delivered in court and the precise verdict physically or verbally agreed to in the jury room, not to discrepancies between the verdict delivered in court and the verdict or general result which the jury testifies it "intended" to reach.

**10.** Closely analogous is the case of *Continental Casualty Co. v. Howard*, 775 F.2d 876, 883–86 (7th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1986). There, the jury, in answering special interrogatories, found liability on only one of the theories of recovery presented to it. On the basis of the verdict, the district court entered judgment for $9,500. Subsequent juror affidavits indicated that the jury thought that on the basis of its verdict the plaintiff would recover $379,000. The court of appeals affirmed under rule 606(b), holding that a contrary result would impermissibly invade the "jury's thought processes." *Id.* at 886.

**11.** Moreover, the same testimony, when analyzed more closely, inescapably requires one to engage in exactly the sort of intrusive inquiry into the jury's deliberations which the rule and courts universally condemn. The testimony could be interpreted as meaning that the jury truly found Robles to be 51% at fault, but thought, albeit erroneously, that the court might still award her some damages if the jury were unable to decide on a figure for damages. Of course, in this situation, the jury's general inclination to "give [Robles] some money" is completely irrelevant and does not undermine its verdict; the jury having found Robles 51% responsible, Texas law demands a judgment in favor of Exxon. Alternatively, the testimony could be interpreted to mean that the jury completely ignored the facts of the case, and settled upon the 51% figure for Robles's fault solely because it wished, in keeping with its erroneous understanding of the court's instructions, the court to determine whether to award damages to Robles. This is the interpretation adopted by the district court, and the basis upon which it decided to resubmit the special interrogatories to the jury.

In our view, therefore, these facts present an even stronger case for the application of rule 606(b) than those found in *Peveto*. The process of merely stating the competing interpretations of this testimony, not to mention trying to decide between them, reveals the true nature of the district court's inquiry: an intrusive, and forbidden, search into the jury's "mental processes."

or considered by the district court. There being no other indication or argument that the jury's first verdict was deficient in any respect, rule 58(2) commands that judgment be entered on that verdict in favor of Exxon.

## IV.

Because the district court erred by considering juror testimony barred by rule 606(b) and refusing to enter judgment on the first verdict, the judgment of the district court is REVERSED, and judgment is RENDERED on the first verdict that Robles take nothing.