**Paul J. PRENDERGAST and Marilyn Alice Prendergast, Appellees,**

v.

**SMITH LABORATORIES, INC., Appellant.**

**No. 87–1710.**

Supreme Court of Iowa.

May 17, 1989.

L.W. Rosebrook and David Swinton of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, Des Moines, for appellant.

James W. Carney and James S. Blackburn of Carney, Hudson, Williams, Blackburn & Grask, Des Moines, for appellees.

Considered by HARRIS, P.J., and LARSON, CARTER, NEUMAN and SNELL, JJ.

CARTER, Justice.

This appeal requires us to decide whether the trial court erred in reforming a jury

verdict based upon the posttrial testimony of jurors that the verdict originally announced and approved by the court differed from the result upon which the jury had agreed. Upon considering the arguments of the parties, we are convinced that the record will not sustain reformation of the verdict and that the proper relief to be granted is a new trial on the issue of damages.

Plaintiff Paul Prendergast suffered injury after receiving an intervertebral injection of a product known as Chymodiactin. On June 28, 1984, he instituted a combined medical malpractice/product liability suit against the hospital, treating physician, a pharmaceutical company, and the appellant, Smith Laboratories, who manufactured the product Chymodiactin. His wife Marilyn brought a claim for loss of consortium. With the exception of Smith Laboratories, all defendants settled with the plaintiffs for undisclosed amounts.

Trial against Smith Laboratories commenced in September 1987. The court instructed the jury that the three other defendants had settled with the plaintiff but were to be assigned their relative portions of fault under comparative fault principles. The court submitted the case on special verdict forms requiring the jury to answer several interrogatories. Interrogatory 14 asked the jury to apportion fault among the four defendants. Interrogatory 15 asked, "What is the amount of Paul Prendergast's damages?" Interrogatory 16 asked, "What is the amount of Plaintiff Marilyn Prendergast's damages?" The instructions did not inform the jury that the court would apply the percentages of fault attributed to the released parties to reduce plaintiffs' recovery from the damages fixed in the answers to Interrogatory 15 and Interrogatory 16. Neither party objected to these instructions based upon this omission.

The jury retired for deliberations on October 12, 1987. On October 13, while still in deliberations, the jury delivered a series of four handwritten questions to the trial judge. The first note inquired about the

identification of an exhibit and is not relevant to this appeal. The second inquired:

Is the percent entered in # 14 for Smith Inc. then multiplied by the amounts in # 15 & 16 for the amounts that will be awarded?

Upon receiving this note, the trial court, without notice to counsel for the parties, returned a handwritten answer to the jury stating:

For your purposes, the percentage amounts in Form # 14 are separate and distinct from the dollar amounts in # 15 and # 16. The Court performs any further necessary calculations.

The third note from the jury asked:

1. # 14 given these percentages
   25% Smith
   25% Mercy
   25% Patrick          EXAMPLE
   25% Sterling

2. and 15 & 16 each reflect 100,000 what amounts will be awarded to each Paul & Marilyn?

Again acting without notice to counsel, the trial judge sent the jury the following written answer:

The Court makes this determination based on your findings and you should determine the amount of damages, if any, without regard to your findings of percentages.

The fourth and final note from the jury asked:

1. If we put amounts on lines 15 & 16 of the special form, are these the amounts the plaintiffs will receive.

After receiving this note, the trial judge called counsel to his chambers to confer regarding the jury's inquiries. After conferring with counsel concerning the jury's fourth request, the trial court returned the following written answer:

In answer to your question attached, I can only inform you that the answer should be determinable by you through a careful reading of the instructions; wherein the liability percentages should be separately decided from the instructions in that regard, and the damages should be separately decided from the instructions in that regard.

There was no objection to this response by counsel. Nor have counsel, at any time, objected to the judge's earlier unilateral responses to the jury's inquiries.

Shortly after receiving this last communication, the jury returned its verdict. The verdict forms indicated that the jury had assigned fifteen percent of fault to Smith Laboratories, sixty percent to the administering physician, twenty-five percent to the hospital, and no percentage to the second pharmaceutical company. In response to Interrogatory 15, "What is the amount of Paul Prendergast's damages?," the jury entered "$500,000." In response to Interrogatory 16, "What is the amount of Plaintiff Marilyn Prendergast's damages?," the jury entered "$50,000." Upon being polled by the court, each juror indicated assent to the verdict as read, and the jury was discharged. If the percentages of fault attributed to the released parties are applied to reduce the damages fixed in the answers to Interrogatory 15 and Interrogatory 16, Paul would recover $75,000 and Marilyn would recover $7500.

With the court's permission, counsel for both parties informally questioned the jury immediately following its discharge. All eight jury members were present at the questioning. In the presence of counsel for both parties and a court attendant, the jurors indicated surprise that the plaintiffs' awards would be reduced from the amounts fixed in Interrogatory 15 and Interrogatory 16. The jurors indicated that they had intended to answer the interrogatories so that Paul and Marilyn Prendergast would recover $500,000 and $50,000, respectively, from the defendant Smith Laboratories.

Based on these conversations, plaintiffs' counsel orally moved for mistrial. The motion was subsequently recast as a "Motion to Recall Jury, Reform Verdict to Comply with Intent of Jury and/or in the alternative, for a New Trial." Over objection by the defendant, the trial court granted plaintiffs' request to recall the jurors for individual questioning. On October 14, 1987, the day following the verdict, the trial court interviewed each of the eight jurors on the record in the presence of counsel. The court selected its questions from those prepared and submitted by counsel. Each juror was brought into the courtroom singly and asked the same set of questions by the trial judge.

When asked the questions, "Did you intend for Paul Prendergast to receive from Smith Laboratories $500,000 or $75,000?" and "Did you intend for Marilyn Prendergast to receive $50,000 or $7,500 from Smith Laboratories?," each of the eight jurors indicated that his or her intent had been to award Paul $500,000 and Marilyn $50,000 from Smith Laboratories.

When asked, "During your deliberations did you ever arrive at a unanimous decision as to the total amount of damages sustained by Paul Prendergast as a result of the incident which was the subject of the lawsuit?," all but one juror indicated that the panel had never determined an amount representing the plaintiffs' total damages. The one exception was the jury moderator, who testified, "We did have a calculator there, but we didn't figure it was necessary to figure that approximate value up, but we knew it was going to be approximately three and a half million if we were to take the 15 percent."

On November 4, 1987, the trial court entered an order reforming the verdict so that Smith Laboratories would be adjudged liable for damages totaling $550,000. The court further concluded that the jury had found the total amount of actual damages sustained to be $3,333,333.33. In an alternative ruling, the court ordered that, in the event its decision reforming the verdict is reversed on appeal, the plaintiffs shall be awarded a new trial on the issue of damages.

In this appeal, Smith Laboratories challenges the reformation of the verdict by the trial court, contending that juror testimony is incompetent evidence to impeach the original verdict. In arguing this contention, it relies primarily on the restrictions which Iowa Rule of Evidence 606(b) imposes on juror testimony.

■ In *Ryan v. Arneson*, 422 N.W.2d 491 (Iowa 1988), we noted the similarity

1987 University Computing Co. v.

between the language of Iowa rule 606(b) and Federal Rule of Evidence 606(b). This prompted us to follow the prevailing interpretation placed on the federal rule. We stated:

> [W]e now adopt the federal rule which protects each of the components of deliberation including juror arguments, statements, discussions, mental and emotional reactions, votes, and any other feature of the process occurring in the jury room.

422 N.W.2d at 495. We held this rule required the trial court to disregard juror affidavits asserting that they had arrived at an illegal quotient verdict.

We recognized in *Ryan*, based on the express language of the rule, that juror testimony may still be offered to show extraneous influences on the jury. We now are faced with deciding whether juror testimony may be received to show a mistake in the completion by the jury of one of a series of special verdict forms.

The critical language of the rule which bears on this issue is as follows:

> [A juror] may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. . . .

Iowa R. Evid. 606(b). This language does not suggest that juror testimony which aids in establishing that which was agreed upon by the jury is prohibited.

Although the principle is not unanimously approved, courts applying Federal Rule of Evidence 606(b) have generally indicated that juror testimony is competent to reveal a mistake in the rendition of an otherwise unanimous verdict. *See, e.g., Attridge v. Cencorp Div. of Dover Technologies Int'l, Inc.,* 836 F.2d 113 (2d Cir.1987); *United States v. Dotson,* 817 F.2d 1127, *modified on other grounds,* 821 F.2d 1034 (5th Cir.

1987); *University Computing Co. v. Lykes–Youngstown Corp.,* 504 F.2d 518, 547 n. 43 (5th Cir.1974). *See generally* 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 606[04] at 606–40 (1987). *See also Chandler v. U–Line Corp.,* 91 N.C.App. 315, 371 S.E.2d 717 (1988) (applying N.C.R. Evid. 606(b)).[1]

These authorities are, we believe, consistent with Iowa decisions antedating rule 606(b). We have recognized in these decisions that the common-law rule rendering juror testimony incompetent to impeach a verdict does not apply to exclude evidence that the jury made an error in recording an otherwise unanimous verdict. *See, e.g., Rutledge v. Johnson,* 282 N.W.2d 111, 114–15 (Iowa 1979). We have allowed reformation of a jury verdict based on juror testimony that it was inaccurately rendered even where the verdict form returned was facially consistent and logical. *See P.M. Lattner Mfg. Co. v. Higgins,* 196 Iowa 920, 195 N.W. 746 (1923). These decisions implicitly recognize that the verdict is not the signed document returned to the court but the actual agreement reached by the jury. Such recognition does not do violence to the intention of rule 606(b).

■ Distinguishing between permissible and impermissible purposes for juror testimony involves balancing the need for stability in jury verdicts with the need to insure that the jury's actual finding in a case be given effect. 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 606[03] at 606–26–27 (1987). The trial court reformed the verdict based on the premise that the jury had found the total damages sustained by Paul and Marilyn Prendergast to be $3,333,333.33. Had the jury made that finding and then gratuitously assumed the task of reducing the award by eighty-five percent prior to entering it on the verdict form, we believe reformation of the verdict, based on juror testimony, would have been proper. In the present case, however, the record falls short of revealing any finding

---

1. *Robles v. Exxon Corp.,* 862 F.2d 1201 (5th Cir.1989), expresses a contrary view and questions whether ascertainment of what the true verdict was can ever be divorced from the mental processes leading to the area of agreement. While we agree that in some instances this line may be difficult to draw, we do not agree that it is an impossible task.

by the jury as to plaintiffs' *total* damages. Consequently, there is nothing in the nature of an established jury finding upon which the trial court's reformation can be upheld. The judgment entered on the reformed verdict must be reversed.

The issue which remains is whether juror testimony concerning the failure to respond to the issue of total damages may be considered as a basis for granting a new trial. We must decide that question in order to determine whether the district court's alternative ruling granting a new trial can be upheld. In dealing with this issue, we have moved beyond the limits of those authorities which permit correction of a mistake in the rendition of the verdict agreed to by the jury. The question has now become whether a verdict may be overturned based on a showing, through juror testimony, that the jury failed to respond to one of a series of special verdict findings.

We must concede that an affirmative answer to this question produces noticeably more tension with the limitations contained in rule 606(b) than is the case with the questions of verdict reformation which we have previously discussed. Notwithstanding the tension which the very restrictive provisions of the rule produce, we find the granting of a new trial is warranted in the present case.

If the issue were whether a verdict may be overturned because it was induced by the jury's misunderstanding of the court's instructions, rule 606(b) would render juror testimony inadmissible for purposes of achieving that result. The situation to which that rule of testimonial exclusion applies, however, presupposes that the jury has in fact responded to the fact-finding process entrusted to it and returned a finding on the issue which was submitted. Once that finding has been solemnized in a formal verdict accepted by the court it may not be impeached on the ground that it was induced by juror misapprehension as to the controlling principles of law.

The vice in the jury's performance in the present case does not fall within the pattern to which the rule applies. The flaw in the present case, as shown by juror testimony, was that the jury made no determination at all on the issue of total damages. If the jury's response on that aspect of the case were treated as one of reformation under the rules recognized earlier in this opinion, the verdict would be reformed to read "no finding made." Consequently, we believe the record reflects an incomplete adjudicative process by the jury rather than an erroneous one. We conclude that juror testimony is admissible to establish that deficiency and that, once it is established to the satisfaction of the court, the best recourse is to order a new trial on the omitted issue. In the present case, this requires a new trial on the issue of damages.

The judgment of the district court entered on the reformed verdict is reversed. Its alternative ruling granting a new trial on the issue of damages is affirmed. Costs on appeal are assessed twenty-five percent to the appellant and seventy-five percent to the appellees.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.