GARWOOD, Circuit Judge:
 

 Doyle Marshall Willey (Willey) appeals his convictions on thirty-one counts of bankruptcy fraud, conspiracy to commit bankruptcy fraud, aiding and abetting the making of a false statement on a loan application, aiding and abetting the concealment of assets from the Resolution Trust Corporation (RTC) and the Federal Deposit Insurance Corporation (FDIC), and aiding and abetting money laundering. We affirm in part, reverse in part, vacate the sentence, and remand for resen-tencing.
 

 Facts and Proceedings Below
 

 In January 1988, Sam Houston National Bank (Sam Houston Bank) of Huntsville, Texas, failed. Willey, a Huntsville real estate and timberland developer, was a director of Sam Houston Bank; Albert Homaday (Hornaday) was its president from August 1987 until January 1988 and was a life-long friend of Willey’s.
 
 [1]
 
 While investigating the bank’s failure, the FBI uncovered potentially fraudulent activity with respect to a piece of property in Sam Houston Bank’s real estate owned portfolio (the Richards Road property). This information led investigators to inquire into the activities of Willey, Horna-day, Willey’s wife, Kimberly Bacon (Bacon),
 
 [2]
 
 and Shadylane Farms, Inc. (Shadylane Farms), a corporation set up by Willey and Bacon and wholly-owned by Bacon. This investigation revealed that Willey, who had declared personal and corporate bankruptcy in 1990 and thereby walked away from approximately $46 million in unsecured debt, had undertaken, with the assistance of Bacon, Hornaday, and Shadylane Farms, to shield the majority of his and his company’s assets from creditors.
 

 In June 1992, federal agents applied for and were granted warrants to search both the home in which Willey and Bacon were then living (the Sunset Lake Road house) and the Richards Road property, which Sha-dylane Farms had just purchased from Hor-naday and into which Willey and Bacon were then in the processing of moving. The voluminous documentary evidence seized during the search revealed a labyrinthine series of financial transactions involving numerous corporate entities with which Willey was associated.
 
 [3]
 
 Although Willey and his company, MWI Land, Inc. (MWI), received significant amounts of money from these various corporations and had access to and/or control over approximately twenty corporate and personal bank accounts, Willey was not listed as an employee in state-mandated reports for any
 
 *1378
 
 company other than MWI.
 
 [4]
 
 In addition, although Bacon, or Willey and Bacon, were signatories on most of the accounts, none were in Willey’s name; most had been opened as “trust” accounts,
 
 [5]
 
 with Willey’s interest undisclosed, by Bacon in her own name, or in a corporate name.
 

 Based on this information, Willey, Bacon, Hornaday, and Shadylane Farms were charged in a 32-eount indictment with bankruptcy fraud, conspiracy to commit bankruptcy fraud, aiding and abetting the making of a false statement on a loan application, aiding and abetting the concealment of assets from the RTC and the FDIC, and aiding and abetting money laundering.
 
 [6]
 
 The government contended that, beginning in 1986, Wil-ley funneled money belonging to him and MWI through the corporate and personal accounts that he controlled, but with which he was not conspicuously associated, enabling him to continue to enjoy assets that should have become part of his and MWI’s bankruptcy estates. Focusing on two pools of money totalling $400,000 that had been paid to MWI in July 1986, the government painstakingly traced the money through a convoluted series of transfers from the various nominee and “trustee” accounts that Willey controlled. The evidence showed that, from 1986 to 1992, Willey and Bacon used the money in these accounts to purchase various assets — land, cattle, a fur coat, vehicles, mineral interests, and most importantly, the Richards Road property and improvements thereon. We will not here recount the intricate web of transfers and transactions by which most of these assets were shown to have come into Willey’s possession. Because the transactions related to the financing, improvement, and purchase of the Richards Road property were central to many of the charges in this ease, however, a somewhat more detailed recounting of them is appropriate.
 

 The Richards Road property was a 61-acre tract of land with a house.
 
 [7]
 
 When Sam Houston Bank hired Hornaday in August 1987, it gave him, as part of his compensation package, a lease purchase agreement on the property under which he paid $200 a month in rent. After Sam Houston Bank failed, the FDIC, in its capacity as receiver, decided to advertise the property for public bids. Two bids were submitted, one from Willey, acting as broker for D.E. Hughes, for $200,000 and one from Sam Dominey (Dominey) for $200,-100; the appraised market value of the property was $244,000. The FDIC accepted Do-miney’s bid, but Hornaday filed an affidavit in the county property records asserting the priority of his purchase option, and Dominey refused to close the purchase with this cloud on the title. Thereafter, Hornaday submitted a bid on April 21, 1988,
 
 [8]
 
 in the amount of $200,100, and the sale was closed May 31, 1988.
 
 [9]
 

 
 *1379
 
 From the time Hornaday purchased the Richards Road property in May 1988 until June 1989, when Shadylane Farms entered into a lease with an option to purchase the property, Willey, through various of his nominee accounts, advanced Hornaday money to pay the mortgage on the property; after June 1989, Shadylane Farms made the payments.
 
 [10]
 
 Nevertheless, Hornaday continued to live on the property until Shadylane Farms bought it outright in June 1992. In addition, the government introduced substantial evidence that Willey was making improvements on the Richards Road house long before Shadylane Farms actually purchased it in June 1992.
 
 [11]
 
 Payments for these improvements came from various of the accounts to which Willey had access.
 
 [12]
 
 Willey characterized the payments to Hornaday for the mortgage and improvements on the Richards Road property as loans, but was forced to admit that there were no promissory notes memorializing these alleged loans and that he had not listed the loans on his bankruptcy petition as a debt owed him.
 

 Following ten days of testimony, a jury found Willey guilty on all counts.
 
 [13]
 
 The district court sentenced Willey to 60 months’ imprisonment on the conspiracy, bankruptcy fraud, and concealment from federal agency counts (counts 1 and 3-24), 24 months’ imprisonment on the false statement count (count 2), and 97 months’ imprisonment on the money laundering counts (counts 26-31), all sentences to run concurrently. In addition, the district court imposed a 3-year term of supervised release on counts 1 and 3-31, a 1-year term of supervised release on count 2, a fíne of $15,000, and special assessments totalling $1500.
 

 In his timely appeal, Willey contests the sufficiency of the evidence to support the “conceal or disguise” element of his money laundering convictions under 18 U.S.C. § 1956(a)(l)(B)(i). In this same vein, he claims that the opinion testimony of IRS Special Agent Lana Stone respecting the conceal or disguise element was highly prejudicial and therefore improperly admitted. He further claims that, even if the government’s evidence was sufficient to prove money laundering, the district court erred in sentencing him under the Sentencing Guidelines’ money laundering provisions because his conduct is not within the “heartland” of criminal behavior that the provisions were meant to address. With respect to the other offenses, he claims that the search of his two homes grossly exceeded the scope of the warrant and that therefore the fruits of the search should have been suppressed. Even if the search was appropriate and the evidence seized was therefore admissible, Willey challenges the sufficiency of the evidence of intent to commit the bankruptcy fraud and transfer and concealment crimes. He claims
 
 *1380
 
 that the evidence was likewise insufficient to support his conviction on the false statement count because, he alleges, the statement at issue was neither false, material, nor known to him. Lastly, he argues that the district court erred in failing to resolve a factual dispute regarding the Presentence Report’s (PSR) calculation of certain moneys said to have been laundered by him.
 

 Discussion
 

 I. Bankruptcy Fraud and Transfer and Concealment Counts
 

 A person commits the crime of bankruptcy fraud when he “transfer[s] or conceal[s] property (1) knowingly, (2) fraudulently, and (3) in contemplation of a case under title 11 or with intent to defeat the provisions of title 11.”
 
 United States v. West,
 
 22 F.3d 586, 589 n. 8 (5th Cir.),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 584, 130 L.Ed.2d 498 (1994);
 
 see
 
 18 U.S.C. § 152. Under 18 U.S.C. § 1032, it is a crime to “knowingly conceal[] or endeavor[] to conceal an asset or property from the Federal Deposit Insurance Corporation, acting as conservator or receiver or in the Corporation’s corporate capacity with respect to any asset acquired or liability assumed by the Corporation ...” 18 U.S.C. § 1032(1). This section also criminalizes concealing assets from the RTC or any conservator appointed by an enumerated agent of the United States.
 
 Id.
 
 This Court has held that a transfer made with the requisite intent may be prosecuted even though it occurred more than one year before the debtor declared bankruptcy.
 
 [14]
 

 West,
 
 22 F.3d at 590.
 

 Willey contests the sufficiency of the government’s evidence with respect to the intent element of both these offenses. In reviewing a sufficiency challenge, the evidence, whether direct or circumstantial, is reviewed in the light most favorable to the jury verdict.
 
 United States v. Nguyen,
 
 28 F.3d 477, 480 (5th Cir.1994). All credibility determinations and reasonable inferences are to be resolved in favor of the verdict.
 
 Id.
 
 The evidence is sufficient if it could lead a rational factfinder to conclude that the essential elements of the crime have been proved beyond a reasonable doubt.
 
 United States v. Villasenor,
 
 894 F.2d 1422, 1425 (5th Cir.1990). In making such a determination, “[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.”
 
 United States v. Bell,
 
 678 F.2d 547, 549 (5th Cir.1982) (en banc),
 
 aff'd on other grounds,
 
 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). Willey argues that the government failed to adequately rebut his contention that all the financial arrangements he made were for the benefit of his children, whom he feared would be short-changed in the aftermath of his acrimonious divorce from his first wife. He contends that the government’s largely circumstantial ease is insufficient to rebut his assertion of innocent intent. We disagree.
 

 The government’s theory of this ease was that Willey was contemplating bankruptcy in 1986 and thus began to transfer assets out of his name to various individual and corporate nominees and “trustees.” The evidence focused primarily on two cheeks totalling $400,-000 that MWI received in mid-July 1986. Almost immediately upon receiving these checks, Willey transferred them to an attorney acting as “trustee.” At this same time, Willey filed a motion to obtain a temporary restraining order in connection with his divorce from his first wife.
 
 [15]
 
 To the motion, he attached an affidavit averring that, unless restrained, his wife would “[i]ncur massive debts as she did when she recently filed suit in this county seeking a divorce from me.” He went on:
 

 
 *1381
 
 “Because of present economic conditions, I am and have been for some time, in extreme financial difficulty. I have been forced to consider relief through the Federal Bankruptcy Court.”
 

 This affidavit was signed July 21, 1986, the same day Willey transferred the first check to his putative “trustee.”
 

 Starting in 1988, Willey’s financial fortunes took a decided turn for the worse. He lost more than $1.2 million in the collapse of Sam Houston Bank and an additional $286,242 in the demise of Spindletop Savings. In addition, corporate loans Willey had personally guaranteed began to fall through, and judgments against him started to accumulate. Although Willey testified at trial that he was not considering bankruptcy at that time, he admitted that he was in dire financial straits. A letter found among his personal files, dated March IS, 1989, referred Willey to a San Antonio bankruptcy attorney who the writer claimed was “ ‘the best bankruptcy attorney I have ever visited. Super smart and tough. In addition, he is the alternate trustee for bankruptcy filings, thus no hassle on your plan, etc. Give me a call.’”
 

 On July 20, 1989, Willey gave a deposition in connection with the collection of a judgment against him and MWI on a loan guarantee; portions of that deposition were read into the record. In the deposition, Willey averred that he had “shut down all operations” of MWI in mid-1986, that the company was “defunct” and held no assets, and that he had been living on money borrowed from his family. He testified that he owned no real estate other than his home and that his children owned no real estate; he later testified that MWI held no real estate or leasehold interests. He also testified that he did not own a vehicle, that he had borrowed Bacon’s car to come to the deposition, and that she did not hold any property that belonged to him. He affirmed that no one else was holding any property on his behalf and that MWI had not transferred any assets to other persons. He testified that he owned no jewelry, except for a $850 Bulova watch, no weapons, no commodities, securities, or mutual funds, and no equipment. Under the evidence, the jury could find that this testimony was false and then known to be so by Willey.
 

 Willey declared personal bankruptcy under Chapter 7 on August 28, 1990. The total amount of unsecured debt reflected in his petition was in excess of $26 million, largely as a result of personal guarantees he had signed on corporate loans. On his bankruptcy schedules, Willey declared that no one was holding anything of value in which he had an interest. He listed his Sunset Lake Road home but no other real property or leasehold interests. Willey farther declared that he owned personal property (clothing and a watch) with a total value of $1000, had $45 cash on hand at the time he filed the bankruptcy petition, and otherwise owned no jewelry, firearms, automobiles, livestock, or farming equipment. MWI’s Chapter 7 bankruptcy petition, filed September 25, 1990, showed a similar dearth of assets and listed $20,942,806.63 in unsecured debt. Accordingly, both bankruptcy trustees filed reports of no distribution in their respective cases. Willey was discharged on February 6, 1991, and his personal bankruptcy was closed on June 27,1991; MWI’s bankruptcy was closed on December 11, 1990.
 

 The evidence showed that, despite these sworn statements, Willey and MWI had substantial assets that were being held by various nominees, most significantly Bacon, Hor-naday, and Shadylane Farms. Each of the bankruptcy fraud and concealment counts was keyed to a specific asset or group of assets; each of these assets was ultimately traced back to Willey or MWI.
 
 [16]
 
 Although most of these assets were not titled in Wil-ley’s or MWI’s name, the evidence adequately showed that these were mere nominee arrangements, that Willey or MWI had actually financed the purchases, and that Willey
 
 *1382
 
 continued to derive benefit from the assets and used or dealt with them as his own property; those that had not been transferred out of Willey’s name, such as various firearms and a $3750 designer watch, were simply not declared on either bankruptcy petition.
 

 Having reviewed the entire record in this case, we conclude that the government’s evidence of culpable intent was more than sufficient to support the jury’s verdicts on these counts. At base, Willey’s challenge to the sufficiency of the evidence on these charges is that the government’s largely circumstantial case is insufficient to rebut his direct testimony that he concealed the money with the intent only to benefit his children. He cites precedent from this Court stating that, “[i]f the ‘evidence viewed in the fight most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged,’ this Court must reverse the convictions.”
 
 United States v. Menesses,
 
 962 F.2d 420, 426 (5th Cir.1992) (citation omitted). This, however, is not the case here. The government’s circumstantial case on the bankruptcy fraud and transfer and concealment counts was overwhelming. Willey’s only substantial evidence of his professed contrary intent was his own testimony and that of Bacon and another of Willey’s nominees, which the jury was free to give whatever weight it chose.
 
 [17]
 
 The bankruptcy fraud and transfer and concealment convictions are affirmed.
 

 II. Fraudulent Statement Count
 

 Count 2 of the indictment charged Willey with aiding and abetting the making of a false statement on a loan application in violation of 18 U.S.C. § 1014. The evidence supporting this count involves Hornaday’s application for a $250,000 loan from Bedford Savings Association (Bedford Savings) to fund both the purchase of the Richards Road property and various improvements to the house there. According to the government’s allegations, it was actually Willey who intended to and did in fact, through Bacon and later Shadylane Farms, make payments on the Richards Road property. Given this arrangement, the government alleged that Hornaday’s statement on the loan application that he would be solely responsible for repayment of the loan was fraudulent. To prove a violation of section 1014, the government was required to show that Hornaday knowingly made a false statement on the application, that Willey authorized or directed Hornaday to do so, and that the statement was material.
 
 United States v. Thompson,
 
 811 F.2d 841, 844 (5th Cir.1987). Willey contests the sufficiency of the evidence as to all three elements of the offense.
 

 Hornaday’s loan application was admitted into evidence. The financial statement attached to the application, dated August 17, 1987, listed total assets of $1,065,607 and net income of $102,500; on May 31,1988, Homa-day affirmed that his financial condition had not changed, even though he had been unemployed since Sam Houston Bank failed in January 1988. Marilyn Crosson (Crosson) of Bedford Savings, who served as a liaison between the president and Bedford Savings borrowers, testified that she dealt with Wil-ley during the loan negotiations; a letter requesting a draw on the loan, written on MWI letterhead and signed by Willey, also was introduced into evidence.
 

 As noted above, the government showed that, after Hornaday secured the loan, Sha-dylane Farms made the payments on the Richards Road property. In 1989, the year Hornaday purchased the Richards Road property, he and his wife showed a combined wage income of $37,973.29; they claimed mortgage interest deductions of $25,996.07. In 1990, the Hornadays reported $41,301.57 in wage income and $27,260.75 in mortgage interest. The government’s expert testified that, in each instance, the reported wage income would generally be insufficient to
 
 *1383
 
 make the mortgage payments and also cover normal living expenses. That same year, Shadylane Farms reported rent payments of $22,951.60 for a pasture lease; Hornaday, however, reported no rental income for that tax year.
 

 The evidence was sufficient to show that the statement on the loan application was false. Viewing all the evidence in the light most favorable to the verdict, a rational jury could conclude beyond a reasonable doubt that Hornaday would not be solely responsible for repayment of the loan.
 

 Viewed in the light most favorable to the verdict, the circumstantial evidence is also sufficient to establish that Willey directed or authorized Hornaday to make the fraudulent statement. Crosson testified that it was Wil-ley who was her contact during the loan negotiations and who forwarded appropriate records and data to Bedford Savings. Willey and Hornaday were long-time friends, and Willey was the person who directed Horna-day to Bedford Savings, where Willey had borrowed before. Willey’s previous association with Bedford Savings, and his having borrowed money there, also support the inference that he knew the loan application contained this averment. In addition, Willey himself admitted that he was familiar with the banking business generally, which was also shown by other evidence. Finally, the evidence amply demonstrated that Willey actually made the mortgage payments on the Richards Road property.
 

 The question remains, however, whether the statement was material. In the context of this statute, “[a] false statement is material if it is shown to be capable of influencing a decision of the institution to which it was made.”
 
 United States v. Williams,
 
 12 F.3d 452, 456 (5th Cir.1994) (footnote omitted). To prove materiality, however, it is not necessary to show that the statement “actually influence[d] a decision[,] provided that it is capable of doing so. Reliance is irrelevant.”
 
 Id.
 
 at 456 n. 14. The government argues that the statement was material in that Wil-ley could not get a loan from Bedford Savings himself because he was a previous Bed-ford Savings borrower and would have exceeded the bank’s loans-to-one-borrower limits. However, no evidence was introduced showing what Bedford Savings’s loans-to-one-borrower limits were or the amount of Willey’s loan indebtedness to Bedford Savings in May 1988. Without this information, it is impossible to say whether Willey’s being considered a borrower on this loan would have resulted in a loans-to-one-borrower violation.
 

 Nevertheless, the test is not whether the bank could not or would not have made the loan but for the false statement, but whether the statement was properly “capable of influencing” the bank’s decision to grant the loan. Thus, regardless whether a loan to Willey would have breached the bank’s loans-to-one-borrower limits, we cannot say that his involvement in the loan would not have been a factor properly “capable of influencing” the decision to make the loan. The evidence showed that Hornaday was likely not capable of making the mortgage payments on the Richards Road property himself and that he was no more than a nominee borrower for Willey. We think that the jury could reasonably infer that Bedford Savings would properly want to know the party to whom it was making this loan and that the party’s identity itself would be capable of properly influencing its decision to make the loan. The fraudulent statement conviction is affirmed.
 

 III. Money Laundering Counts
 

 Counts 25 through 31 charged Willey with aiding and abetting money laundering contrary to 18 U.S.C. § 1956(a)(l)(B)(i). A person violates section 1956(a)(l)(B)(i) if he conducts or attempts to conduct a financial transaction knowing that the property involved is the proceeds of unlawful activity and knowing that the transaction was designed “to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.” To prove that a defendant aided and abetted money laundering, the government must show that the defendant “associated himself with the unlawful financial manipulations, that he participated in them as something he wished to bring about, and that he sought, by his actions, to make the effort succeed.”
 
 United States v. Termini,
 
 992
 
 *1384
 
 F.2d 879, 881 (8th Cir.1993). Each money laundering count of the indictment alleged a different specific transaction with a different particular check made out by either Bacon, Hornaday, or Shadylane Farms, the funds for which the government’s evidence adequately showed were the proceeds of Willey’s bankruptcy fraud. Willey argues, however, that there is insufficient evidence that the financial transactions charged as money laundering in this case were designed to conceal or disguise their source or origin.
 

 Willey relies principally on the Tenth Circuit’s decision in
 
 United States v. Garcia-Emanuel,
 
 14 F.3d 1469 (10th Cir.1994). In
 
 Garciar-Emanuel,
 
 the defendant was indicted on 17 counts of money laundering in violation of section 1956(a)(l)(B)(i). The defendant and his wife had used the proceeds of the defendant’s criminal enterprise to pay their mortgage, buy land, vehicles, and horses, and make various investments.
 
 Id.
 
 at 1472. All the transactions involved payment by cash or personal or cashier’s check and were conducted in the defendant’s own name or that of his wife or his restaurant.
 
 Id.
 
 A jury found the defendant guilty of all seventeen money laundering counts. The district court, however, granted the defendant’s post-verdict motion for judgment of acquittal as to all these counts, reasoning that, because the transactions did not conceal the defendant’s identity as the person providing the illegal proceeds, the government had failed to meet its burden of proving that the transaction was one that was designed to conceal.
 
 [18]
 

 Id.
 
 at 1473.
 

 The Tenth Circuit disagreed with the district court’s reasoning, but upheld its finding of insufficient evidence of the design requirement as to twelve of the seventeen counts.
 
 Id.
 
 Citing a report of the President’s Commission on Organized Crime, the court defined money laundering schemes as those that “ ‘seek to change large amounts of cash ... into an ostensibly legitimate form, such as business profits or loans,
 
 before using those funds for personal
 
 benefit....’”
 
 Id.
 
 at 1474 (citations omitted; emphasis in
 
 Garcia-Emanuel).
 
 Thus, the court concluded,
 

 “Merely engaging in a transaction with money whose nature has been concealed through other means is not in itself a crime. In other words, the government must prove that the specific transactions in question were designed, at least in part, to launder money, not that the transactions involved money that was previously laundered through other means. If transactions are engaged in for present personal benefit, and not to create the appearance of legitimate wealth, they do not violate the money laundering statute.”
 
 Id.
 

 The design requirement separates the crime of money laundering from the innocent act of mere money spending.
 
 Id.
 
 at 1474. In one sense, the acquisition of
 
 any
 
 asset with the proceeds of illegal activity conceals those proceeds by converting them into a different and more legitimate-appearing form.
 
 Id.
 
 But the requirement that the transaction be
 
 designed
 
 to conceal implies that more than this trivial motivation to conceal must be proved.
 
 Id.
 
 The court thus held that substantial proof of a design to conceal was required; behavior that is merely suspicious but does not evince a design to conceal, as well as “the mere accumulation of non-concealing behavior,” is not sufficient to sustain a conviction for money laundering.
 
 Id.
 
 at 1476.
 

 Reviewing the money laundering counts under these standards, the
 
 Garciar-Emanuel
 
 court affirmed the judgment of acquittal as to those counts involving cashier’s checks on which the defendant himself was noted as remitter.
 
 Id.
 
 at 1476-78. Likewise, as to those counts involving purchases with cash in which the defendant’s name appeared on the contract of sale and those counts involving purchases by personal check in which the defendant’s name appeared on the check, the court upheld the judgment of acquittal.
 
 Id.
 
 at 1478. However, as to count 11, which charged the defendant with causing the issuance of a cashier’s check, on which
 
 his restaurant
 
 was noted as remitter, to purchase
 
 *1385
 
 some land, the court reversed the judgment of acquittal and reinstated the conviction for money laundering:
 

 “The transaction not only creates the false impression that the restaurant was his source of wealth, but it creates documentary evidence in support of that deception that could mislead an investigator. This furthers a launderer’s goal of plac[ing] illicit bulk cash in an economy, [so] it becomes increasingly difficult to uncover their money laundering operation.’ ”
 
 Id.
 
 at 1476-77 (citation omitted; alterations in Garcia-Emanuel).
 

 Using a similar rationale, the court found insufficient evidence to support count 14, involving the use of $15,000 cash as partial payment for a horse, in part because,
 

 “[u]nlike count 11, Defendant did not transfer money to his restaurant, use his restaurant as a remitter, involve his restaurant as a named party in any kind of transaction, or design a paper trail that would lead an investigator to believe that the money for the horse came from some source other than Defendant.”
 
 [19]
 

 Id.
 
 at 1477.
 

 The rule that emerges from the Tenth Circuit’s analysis is that, while a showing of simply spending money in one’s own name will generally not support a money laundering conviction, using a third party, for example, a business entity or a relative, to purchase goods on one’s behalf or from which one will benefit usually constitutes sufficient proof of a design to conceal.
 
 [20]
 
 If this were a typical case, the involvement of the third parties would clearly support the money laundering convictions. The difference in the present case is that the scheme was much more complex than that in
 
 Garcia-Emanuel.
 
 The transactions alleged to constitute money laundering here are not the initial transfers to Bacon, Hornaday, and Shadylane Farms but certain intermediate transactions that the third parties conducted with the money.
 

 Although
 
 Garcia-Emanuel
 
 does state that “the
 
 specific transactions in question
 
 were designed, at least in part, to launder money,”
 
 id.
 
 at 1474 (emphasis added), we do not understand this statement to mean that each transaction must be analyzed in isolation from the alleged scheme in its entirety.
 
 Garcia-Emanuel
 
 itself noted that a design to conceal in a particular transaction may be imputed to a subsequent transaction, although the inference may be weaker than if the concealing transaction itself were charged.
 
 Id.
 
 at 1478. More importantly, the court also noted that other types of evidence, including “depositing illegal profits in the bank account of a legitimate business” and “a series of unusual financial moves cumulating [sic] in the transaction,” had been found to
 
 *1386
 
 support an inference of an intent to conceal.
 
 Id.
 
 at 1476 (footnotes omitted).
 

 Evidence that the defendant commingled illegal proceeds with legitimate business funds has been held to be sufficient to support the design element.
 
 United States v. Jackson,
 
 935 F.2d 832, 842 (7th Cir.1991) (evidence that defendant “treated the [illegal] funds [commingled] in [legitimate church] accounts as his own,” and that he would often “remove[] himself still further from the funds in the church accounts by using the church secretary to present Development Corporation checks made out to cash,” was sufficient to support finding of design to conceal);
 
 see also Termini,
 
 992 F.2d at 881 (commingling of illegal gambling proceeds in legitimate corporate bank accounts sufficient to establish a design to conceal).
 
 [21]
 
 Moving money through a large number of accounts has, in the light of other evidence, also been found to support the design element of this offense, even when all the accounts to which the defendant transferred the money and from which he withdrew it were in his own name.
 
 United States v. Lovett,
 
 964 F.2d 1029, 1036 (10th Cir.1992) (“[T]he purchase of the house was directly facilitated by the defendant’s convoluted series of financial transactions, combined with his numerous misleading statements regarding the nature and source of the proceeds.”),
 
 cert. denied,
 
 — U.S. -, 113 S.Ct. 169, 121 L.Ed.2d 117 (1992),
 
 and cert. denied,
 
 — U.S. -, 114 S.Ct. 576, 126 L.Ed.2d 475 (1993);
 
 [22]
 

 see also United States v. Beddow,
 
 957 F.2d 1330, 1335 (6th Cir.1992) (together with evidence tending to show that the defendant used another person as a “front man” to disguise his ownership of gemstones purchased with illegal drug proceeds, “the evidence of [the defendant’s] convoluted financial dealings with his banks and his charter boat business farther support a conclusion that he intended to disguise the illegal source of his money”).
 

 These cases demonstrate that in order to establish the design element of money laundering, it is not necessary to prove with regard to any single transaction that the defendant removed all trace of his involvement with the money or that the particular transaction charged is itself highly unusual,
 
 [23]
 
 although either of these elements might be sufficient to support a money laundering conviction.
 
 See, e.g., United States v. Campbell,
 
 977 F.2d 854, 858 n. 4 (4th Cir.1992) (evidence was sufficient to establish design to conceal when government demonstrated that the contract for sale of house was altered to reflect a reduction in price of $60,000 after purchaser suggested the change and agreed to give the sellers $60,000 under the table),
 
 cert. denied,
 
 — U.S. -, 113 S.Ct. 1331, 122 L.Ed.2d 716 (1993). That is, it is not necessary that a transaction be examined wholly in isolation if the evidence tends to show that it is part of a larger scheme that is designed to conceal illegal proceeds.
 
 [24]
 
 With these standards in mind, we now turn to the money laundering charges in this case.
 

 Count 25 involved a $6000 check written by Hornaday on his personal account
 
 *1387
 
 at First American Bank in Bryan, Texas. The check was cashed. The source of these funds was two $9000 checks issued March 14, 1990, from Bacon’s brokerage account. Hor-naday deposited this money into his account, less $600 cash, on March 21. As noted above, a design to conceal in a prior transaction can be imputed to a subsequent one, although the inference is weaker than if the initial transaction itself were charged.
 
 See Garcia-Emanuel,
 
 14 F.3d at 1478. Thus, in count 25, although the specific conduct alleged, the issuance of a check by Hornaday from his personal account, is not in itself concealing, it was tied to a transfer from Bacon; the funds in Bacon’s accounts were all traced back to Willey. In the context of this case, a transfer from one third party to another supports a reasonable inference of a design to conceal because it moves the money further away from the defendant than it was before the transfer. Although we note that there is no evidence of what Hornaday did with the money once he cashed the check, there was more than sufficient evidence of the relationship between Willey and Horna-day to support the reasonable inference that Hornaday was acting as a shill for Willey with respect to the Richards Road property. This is sufficient for a reasonable jury to infer that the transaction ultimately inured to Willey’s benefit.
 
 See id.
 
 at 1474. The conviction on count 25 is affirmed.
 

 Counts 27 and 28 were keyed to two $2900 checks issued from a Shadylane Farms account to Hornaday, one dated November 5, 1990, the other dated December 5, 1990, to pay the mortgage on the Richards Road property. Under a reasonable view of the evidence, this is a classic money laundering transaction; the transfer from one third party to another of illegal proceeds in partial payment for an asset that created the appearance of legitimate wealth in the defendant. A rational jury could infer that such a transaction was designed to conceal Willey’s relationship to the proceeds, his involvement in the transaction, and his interest in the property. The convictions on counts 27 and 28 are affirmed.
 

 Count 29 involved the deposit on January 10, 1992, by Bacon into a personal checking account in her name of a $64,988.41 cashier’s check from the Lillie Mae Smith Trust, of which Willey was trustee.
 
 [25]
 
 The cheek represented payment for the purchase of municipal unit trusts owned by Bacon’s brokerage account. The unusualness of this transaction supports a reasonable inference of a design to conceal. In a typical brokerage account transaction, the purchaser pays the broker, and the account holder receives her remuneration through the brokerage account; the brokerage account statement reflects the transaction. In this transaction, however, the check was issued directly to Bacon by the trust as purchaser; the money was not actually passed through the brokerage account and there thus would have been no record at all of the brokerage account ever having sold anything to the Lillie Mae Smith Trust. The transaction thus allowed Willey to get money out of Bacon’s brokerage account without creating any record of his involvement in the transaction. We conclude that such a highly unusual financial transaction, especially one that makes it very difficult to trace the defendant’s involvement, supports a reasonable inference of a design to conceal. The conviction on count 29 is affirmed.
 

 The item referenced in Count 30 was a cashier’s check for $309,371 that Shadylane Farms purchased on May 7, 1992. That cheek, which was intended for the purchase of a tract of land, was redeposited into various bank accounts the next day after the deal fell through.
 
 [26]
 
 Count 31 involved a $200,000 cashier’s cheek purchased by Shadylane Farms on June 5, 1992, for the purchase of the Richards Road property. The govem-
 
 *1388
 
 merit’s expert witness traced both these checks back to the $400,000 MWI originally received in 1986. These two transactions evince a combination of the factors, discussed above, that courts have found probative of a design to conceal: a purchase in a third party’s name; a series of convoluted financial maneuvers leading up to the purchase; and the commingling of illegitimate funds in the accounts of an ostensibly legitimate business. The inference is admittedly more tenuous because the transfers that plausibly constitute money laundering are those going into Shadylane Farms’s account prior to the issuance of the cashier’s checks. In
 
 Garcia-Emanuel,
 
 however, when the evidence showed only one of the probative factors, the court held that, despite the weaker nature of the evidence, this was sufficient to evince a design to conceal.
 
 [27]
 

 Id.
 
 at 1478. The convictions on counts 30 and 31 are affirmed.
 

 However, we are constrained to reverse the conviction on count 26. Count 26 involved a $4500 check issued to Bacon from her brokerage account and deposited by her into one of her personal checking accounts on October 12, 1990. The money in the brokerage account was traced back to Willey. This was the only evidence, other than the government expert’s opinion that the transaction did in fact conceal the source of the proceeds, presented as to this count. In other words, all the government proved was that Bacon had transferred money from one account in her name to another in her name. This clearly is insufficient to support an inference that the particular transaction charged in count 26 was designed to conceal within the meaning of the statute.
 
 [28]
 
 We thus reverse Willey’s conviction on count 26.
 

 IV. Admissibility of Expert Testimony
 

 As part of its case against Willey, the government put on Lana Stone (Stone), a special agent for the IRS Criminal Investigation Division, to show that the particular cheeks specified in counts 25 to 31 represented laundered monies. Stone was asked to describe each transaction, the source of the funds, and then to state whether, in her opinion, the transaction concealed the true source, nature, ownership, or control of the funds. Willey made a timely objection to this last part of Stone’s testimony as improper opinion testimony each time it was elicited; he was overruled each time. Willey argues that, even if there is sufficient evidence of a design to conceal, Stone’s testimony as to the money laundering charges was
 
 *1389
 
 so prejudicial as to require a new trial, not only as to the money laundering charges, but also as to all the charges except count 2.
 

 The decision to admit expert testimony lies within the district court’s sound discretion and will not be overturned unless manifestly erroneous.
 
 United States v. Townsend,
 
 31 F.3d 262, 270 (5th Cir.1994),
 
 cert. denied,
 
 — U.S. -, 115 S.Ct. 773, 130 L.Ed.2d 668 (1995). To be admissible, an expert’s opinion must be helpful to the trier of fact. Fed.R.Evid. 702. Willey argues that Stone’s testimony violated the helpfulness requirement of Rule 702, relying on the Seventh Circuit case of
 
 United States v. Benson,
 
 941 F.2d 598 (7th Cir.1991),
 
 amended,
 
 957 F.2d 301 (7th Cir.1992). In
 
 Benson,
 
 the court held that the testimony of the IRS agent was improperly admitted because the agent testified outside his area of expertise; his testimony therefore violated the helpfulness requirement of Rule 702.
 
 Id.
 
 at 604-05. Willey, however, does not attack Stone’s qualifications as an expert; instead, he argues that Stone’s opinion testimony was objectionable because Stone’s specialized knowledge was not necessary to help the jury understand whether the transaction was concealing. In other words, Willey argues that Stone was no more qualified than the jury to conclude that the transaction was concealing, and her testimony therefore did no more than tell the jury what conclusion to reach.
 

 An expert may properly offer an opinion “[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.” Fed.R.Evid. 702. The rule thus allows experts to suggest an appropriate inference to be drawn from the facts in evidence if the expert’s specialized knowledge is helpful in understanding the facts. The rule has been interpreted to “permit expert opinion even if the matter is within the competence of the jurors if specialized knowledge will be helpful, as it may be in particular situations.” 1
 
 McCormick on Evidence
 
 § 13 at 54 (1992) (footnote omitted).
 

 Although we do not recommend the present case as a model for eliciting expert testimony, on balance we tend to believe that the district court did not abuse its discretion by admitting this testimony. Certainly, the admission was most damaging with respect to count 26 because there was no evidence other than Stone’s testimony supporting the inference of a design to conceal with respect to that count, but we have reversed the conviction on that count. As to the remaining money laundering counts, we conclude that, even if error occurred, it was undoubtedly harmless. Stone clearly stated the bases for her conclusions, and those conclusions were supported by the overwhelming evidence.
 
 [29]
 
 In these circumstances, we do not think there was a significant risk that Stone’s testimony “supplant[ed the] jury’s independent exercise of common sense.”
 
 Scott v. Sears, Roebuck & Co.,
 
 789 F.2d 1052, 1055 (4th Cir.1986).
 

 V. Legality of the Search
 

 On June 11, 1992, state and federal agents, acting pursuant to a search warrant and a civil forfeiture
 
 in rem
 
 warrant, searched Willey’s Sunset Lake Road home and the Richards Road property. The search warrant listed the items to be seized
 
 *1390
 
 as a variety of documentary evidence as well as “any other fruits, proceeds, evidence, and instrumentalities of the delineated violations.” In executing the search, agents seized not only documentary evidence, but also jewelry, vehicles, cattle, firearms, a big screen television, and other items not specifically described in the warrant. Willey sought to suppress the evidence on Fourth Amendment grounds, but the district court denied the motion.
 
 [30]
 

 Willey argues that the items seized that were not described with particularity in the warrant (e.g., the firearms, jewelry, cattle, etc.) should be suppressed because they were outside the valid scope of the warrant.
 
 [31]
 
 “[U]nder the ‘severability’ doctrine, items that are illegally seized during the execution of a valid warrant do not affect the admissibility of evidence legally obtained while executing the warrant.”
 
 United States v. Hamilton,
 
 931 F.2d 1046, 1053-54 (5th Cir.1991). Nevertheless, Willey argues that a new trial is necessary because the admission of the allegedly illegally seized items was not harmless.
 

 Of course, the severability doctrine assumes that the items in question were in fact illegally seized, that is, that they were outside the valid scope of the warrant. The items at issue in this ease, however, fell within the scope of the warrant. The warrant in this case allowed the agents to seize “other fruits, proceeds, evidence, and instru-mentalities of the delineated violations.” This language is similar to that contained in the warrant approved of in
 
 Andresen v. Maryland,
 
 427 U.S. 463, 479-80, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976). In
 
 Andresen,
 
 the Supreme Court held that, read in context, the language was sufficient to limit the warrant to a search only for fruits of the particular crimes the defendant was alleged to have committed.
 
 Id.
 
 at 479-83, 96 S.Ct. at 2748-49. The fact that some of the evidence seized led to charges against the defendant for a different crime was not relevant because the agents had probable cause to seize the evidence in connection with the offense named in the warrant.
 
 Id.
 
 at 481-85, 96 S.Ct. at 2749-50. That probable cause arose from the agents’ knowledge, not set forth in the warrant, that the defendant had been involved in a number of other fraudulent transactions, as well as the agents’ familiarity with the defendant’s method of operations, did not invalidate the warrant.
 
 Id.
 
 at 483-85, 96 S.Ct. at 2750.
 

 In the present case, the “other fruits” language in the warrant does not even need to be read in context; the sentence itself describes the evidence sought as that relating to the “delineated violations,” which were specifically enumerated in the warrant. Wil-ley nevertheless argues that, because the items were not specified in the warrant, they should be suppressed, implying that, because the items seized were tangible physical property, not the type of documentary evidence specifically referenced in the warrant, they were outside its scope. As a theory, there may be some validity to this argument. “ ‘The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another.’ ”
 
 Stanford v. Texas,
 
 379 U.S. 476, 485-86, 85 S.Ct. 506, 512, 13 L.Ed.2d 431 (1965) (quoting
 
 Marron v. United States,
 
 275 U.S. 192, 195-
 
 *1391
 
 98, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927)). When detailed particularization is not practicable, however, “generic language suffices if it particularizes the types of items to be seized.”
 
 United States v. Webster,
 
 734 F.2d 1048, 1055 (5th Cir.),
 
 cert. denied,
 
 469 U.S. 1073, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984).
 

 Nevertheless, given the facts of this case, the district court did not err in admitting the “other fruits” that were seized during the search, even though they were not documentary evidence. The affidavit of Agent John Mabry, which was attached to the warrant and incorporated in it by reference, stated that agents had observed Willey arrive at the Richards Road property in a truck and that they had seen cattle on the property, which further investigation revealed to belong to Willey. Agents had seen copies of Willey’s and MWI’s bankruptcy petitions and knew that both had claimed no assets. This, coupled with the nature of the alleged scheme, was sufficient to give the agents probable cause to seize these other items. Willey is simply mistaken in thinking that there was “nothing about his possession of, for example, a television set, or a gold bracelet, or a wallet containing $204 in cash, to give the agents probable cause to believe they are ‘fruits’ of bankruptcy fraud.” For one thing, the warrant specifically referenced currency. Moreover, the very nature of bankruptcy fraud suggests that the defendant is hiding assets, and money laundering suggests, at least to some extent, the conversion of liquid assets into apparently legitimate tangible property. It is therefore wholly reasonable to suspect that expensive assets in the defendant’s possession may be tied to that scheme, either because they were not disclosed on the bankruptcy petition or because they were purchased with funds wrongfully withheld from creditors.
 

 At all events, assuming
 
 arguendo
 
 that the items complained of were outside the scope of the warrant, their seizure would nevertheless have been appropriate under the plain view doctrine.
 
 See United States v. Hill,
 
 19 F.3d 984, 989 (5th Cir.) (seizure of items in plain view is appropriate if officer has probable cause to believe that the items are “either contraband or will be useful in establishing that a crime has been committed”), ce
 
 rt. denied,
 
 — U.S. -, 115 S.Ct. 320, 130 L.Ed.2d 281 (1994). The district court did not err in denying the motion to suppress.
 

 VI. Sentencing
 

 Willey challenges his sentence in two respects. First, he contends that, even if his convictions for money laundering are upheld, his sentence under the money laundering sections of the Sentencing Guidelines should be reversed because his conduct does not fall within the “heartland” of criminal activity the statute was meant to punish. The Sentencing Guidelines contemplate that
 

 “the sentencing courts [will] treat each guideline as carving out a ‘heartland,’ a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.” U.S.S.G. ch. 1, pt. A, emt. 4(b).
 

 A district court’s refusal to grant a downward departure provides no basis for appeal.
 
 [32]
 

 United States v. Miro,
 
 29 F.3d 194, 198 (5th Cir.1994). Moreover, Willey offers no evidentiary support for the argument that his behavior is not typical of money launder
 
 *1392
 
 ing schemes. His objections to the PSR indicate that he argued before the district court that his conduct did not come within the normal range of conduct contemplated by the money laundering guidelines because the money laundering transactions were only a relatively small fraction of the criminal conduct of which he was convicted. This is not what the “heartland” requirement contemplates, however; rather it focuses on the type of
 
 conduct
 
 for which the defendant is convicted, not the amount of the conduct relative to other criminal acts.
 
 See
 
 U.S.S.G. ch. 1, pt. A, cmt. 4(b) (describing the “heartland” as “a set of typical cases
 
 embodying the conduct that each guideline describes,”
 
 and an “atypical case” as “one to which a particular guideline linguistically applies but
 
 where conduct significantly differs from the norm”)
 
 (emphases added). The district court did not err in applying the money laundering guidelines.
 

 Willey claims that the district court further erred at sentencing in failing to make specific factual findings as to two disputed amounts used to calculate the total value of funds attributable to the crime, as required by Fed.R.Crim.P. 32(c)(3)(D). “[W]here there are disputed facts material to the sentencing decision, the district court must cause the record to reflect its resolution thereof, particularly when the dispute is called to the court’s attention.”
 
 United States v. Warters,
 
 885 F.2d 1266, 1272 (5th Cir.1989). On the other hand, “[the] adoption of the [PSR’s] findings indicates that the court, ‘at least implicitly, weighed the positions of the probation department and the defense and credited the probation department’s determination of the facts.’ ”
 
 United States v. Ramirez,
 
 963 F.2d 693, 706 (5th Cir.),
 
 cert. denied,
 
 — U.S. -, 113 S.Ct. 388, 121 L.Ed.2d 296 (1992) (citation omitted).
 

 The district court in this case specifically adopted the findings of the PSR. The PSR characterized the two disputed amounts as “monies laundered.” Both the disputed amounts were commissions Willey earned approximately a year after he was discharged in bankruptcy that he had directed be paid directly to Shadylane Farms. At sentencing, the government contended that these amounts were part of Willey’s continuing effort to defraud creditors by using Shadylane Farms to hide assets that really belonged to him and MWI.
 

 In
 
 United States v. Moody,
 
 923 F.2d 341 (5th Cir.),
 
 cert. denied,
 
 502 U.S. 821, 112 S.Ct. 80, 116 L.Ed.2d 54 (1991), this Court held that the bankruptcy fraud statute was broad enough to encompass both pre- and post-petition transfers.
 
 Id.
 
 at 346-47. The broad coverage of the statute, however, stems from a concern for minimizing “the level of interference with the administration of the debtor’s bankruptcy estate that might arise from unregulated transfers.” 1
 
 Collier on Bankruptcy
 
 ¶ 7A.02[7][a][v] at 88. Discharge of the debtor at least partially alleviates this concern.
 
 [33]
 
 In any event, even if it were true that Willey titled these commissions in Shadylane Farms’s name to avoid detection of the earlier bankruptcy fraud, there is nothing to suggest that these commissions were part or proceeds of or attributable to bankruptcy fraud as they were earned after Willey was discharged. Nor, without more substantial proof that Willey agreed with the other defendants at the outset to conceal the bankruptcy fraud, can the government bring these monies within the conspiracy count.
 
 See Grunewald v. United States,
 
 353 U.S. 391, 404-06, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957) (“But a vital distinction must be made between acts of concealment done in furtherance of the
 
 main
 
 criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the pur
 
 *1393
 
 pose only of covering up after the crime.... In the latter case, as here, the acts of covering up can by themselves indicate nothing more than that the conspirators do not wish to be apprehended — a concomitant, certainly of every crime since Cain attempted to conceal the murder of Abel from the Lord.”).
 
 [34]
 

 The district court therefore could not have properly included these amounts in the calculation of the total funds attributable to the money laundering crimes. Nor was this error harmless; if these two amounts had not been included, the total amount of funds attributable to those crimes would have been less than $1,000,000, and the increase in Wil-ley’s base offense level would have been only 4, rather than 5.
 
 See
 
 U.S.S.G. § 2Sl.l(b)(2)(E). We must therefore vacate the sentence and remand the case to the district court for resentencing.
 

 Conclusion
 

 For the foregoing reasons, Willey’s conviction on count 26 is REVERSED and his convictions on all other counts are AFFIRMED. Willey’s sentence is VACATED and the cause REMANDED to the district court for resentencing due to the reversal of count 26 and because of the erroneous inclusion of funds earned post-bankruptcy in the total amount of funds attributable to the money-laundering counts.
 

 AFFIRMED in part; REVERSED in part; VACATED in part and REMANDED for resentencing.
 

 [1]
 

 . The record is unclear as to when Homaday assumed the presidency of Sam Houston Bank. Willey testified that Homaday had been hired as a computer operator with the intention of making him president when the bank's then-current president left. Other witnesses referred to Hor-naday simply as Sam Houston Bank's president.
 

 [2]
 

 .At the time of this investigation, Bacon was actually Willey's girlfriend and, at some later point, his fiancee. Bacon had originally been hired by Willey as a part-time secretary in 1984; their relationship became intimate some time in 1986 during the break-up of Willey’s first marriage. Willey and Bacon were married on June 13, 1992.
 

 [3]
 

 .Willey was involved in or affiliated with a large number of small corporations and unincorporated business ventures in east Texas. The evidence showed that Willey was affiliated with the following entities: Dizbo, Inc.; Megachips, Inc.; O.D., Inc.; One Lake Place, Inc.; OKC Limited; MWI Land, Inc.; Marshall Willey Investments; MWI Company; Linscomb Willey Joint Venture; Junction Square Properties; Woodridge Motor Company; Foxhall, Inc.; Texla Holding Company; KLB Company; Mount Pleasant Village; and Shadylane Farms, Inc.
 

 [4]
 

 . Records of the Texas Employment Commission (TEC) listing paid employees showed that Willey was not listed as an employee or officer for any of the companies listed in footnote 3 (other than MWI). MWI reported to the TEC from 1986 to 1988, but neither Shadylane Farms nor Texla ever filed an employee report with the TEC. The only listed employee of Foxhall was H.P. Williams. In 1990, MWI received over $10,000 in deposits from OD, Dizbo, and Foxhall in a single day. In addition, although the only listed employee of Megachips was Andrew Dunn, evidence showed that Megachips filed a 1099 form with its 1990 tax return reporting miscellaneous payments to Willey totalling $19,985.44; Willey reported that amount as income in his personal return for that year.
 

 [5]
 

 . Although Willey set up a number of accounts that he designated as "trust" accounts, none of these was a true trust; Willey had actual control over the funds in the accounts.
 

 [6]
 

 . Count 32, the forfeiture count, is not at issue in this appeal.
 

 [7]
 

 . The property included improved and fenced pasture land, a pond, various outbuildings, and a bam and stalls. The house had four bedrooms and 4615 square feet of enclosed space.
 

 [8]
 

 . On March 18, 1988, Willey had placed money in an escrow account with a local title company for the FDIC auction on the Richards Road property. On April 21, 1988, the title company purchased a cashier’s check payable to the FDIC out of the escrow money. The title company was listed as the remitter; the check bore the notation "for Albert B. Hornaday.”
 

 [9]
 

 . This is the loan that is the subject of count 2, charging Willey with aiding and abetting the making of a false statement on a loan application. This count is discussed in part II of the text,
 
 infra.
 

 [10]
 

 . Shadylane Farms was incorporated in June 1989. Bacon testified that the company was set up to allow her to go into the cattle business.
 

 [11]
 

 . James Thompson (Thompson) of Thompson Custom Homes testified that Willey called him in 1988 to do remodeling work on the Richards Road house. Even though Hornaday was living in the house at that time, it was Willey who negotiated for and closed the deal on the improvements, although he did inform Thompson that he was going to pay for the work through an improvement loan Hornaday had received in connection with his purchase of the property. In total, Thompson billed Willey $32,583.92 for the improvements.
 

 [12]
 

 . Payments made on December 22, 1988, and March 7, 1989, to Thompson Custom Homes came from Foxhall. On April 6, 1989, Texla wrote a check on its account to purchase carpet for the Richards Road house; a check written from the same account on April 10, 1989, was paid to Thompson Custom Homes. In August and September 1989, Bacon wrote checks out of one of her personal accounts for a refrigerator, a dinette table and eight chairs, and for resurfacing the driveway at Richards Road; a second check for the resurfacing work came from Sha-dylane Farms's account. Willey made one payment to Thompson Custom Homes in cash. A $7000 check to Hood Ornamental for a gate, a January 12, 1989, payment to Thompson Custom Homes, and a payment to A.T. Scott for painting the house were all paid for by Hornaday out of an improvement loan he took out with Bedford Savings Association. The total value of the improvements to the property was $79,529.09.
 

 [13]
 

 .Willey, Bacon, Hornaday, and Shadylane Farms were originally tried together, but Homa-day’s case was severed on the sixth day of trial after he became too ill to continue. Bacon, who was also found guilty on all counts, originally filed notices of appeal in her case and on behalf of Shadylane Farms as its president, but withdrew them after having completed her sentence.
 

 [14]
 

 . Under the bankruptcy laws, a debtor may not be discharged if he fraudulently conceals or transfers property within one year of declaring bankruptcy. 11 U.S.C. § 727(a)(2)(A). The doctrine of continuing concealment, however, can operate to deny the debtor a discharge even though the actual transfer in question occurred more than one year before the debtor declared bankruptcy.
 
 See In
 
 re
 
 Olivier,
 
 819 F.2d 550, 554-555 (5th Cir.1987).
 

 [15]
 

 . Willey and his first wife reconciled briefly some time in early 1987, but Willey reinstated divorce proceedings in May 1987 after his wife was arrested for assaulting Bacon. The divorce became final on December 20, 1988.
 

 [16]
 

 . Specifically, the assets charged to have been concealed in Willey's personal bankruptcy were the Richards Road property, a 1985 Chevrolet truck, a tractor, a livestock trailer, twelve firearms, twenty-eight head of cattle, jewelry, and a large screen television. Assets alleged to have been concealed in MWI’s bankruptcy were $200,-000 in cash (part of the $400,000 MWI received in July 1, 1986), 61 acres of land in Houston County, Texas, three lots of land located in Walker County, Texas, and mineral rights on land located in Sabine County, Texas.
 

 [17]
 

 . Indeed, given that the "Willey Children's Trust” was only a bank account that never had more than $9000 in it, that a substantial amount of money was transferred from the children's account to Shadylane Farms, and that both Bacon and Willey admitted on cross-examination that none of the arrangements they had made would protect the children’s purported interest in the property held in Bacon’s and Shadylane Farms's names, the jury had ample evidence to discredit Willey's professed intent to benefit his children.
 

 [18]
 

 . The district court held that the defendant was so closely associated with his restaurant that dealings in its name did not conceal the defendant's personal involvement.
 
 Garcia-Emanuel,
 
 14 F.3d at 1473.
 

 [19]
 

 . The court noted that the defendant had made an oral misrepresentation to the seller concerning the source of the cash, representing that it was profits from his restaurant business, but "only after a paper trail had already been created that clearly connected Defendant to the cash.”
 
 Garcia-Emanuel,
 
 14 F.3d at 1477.
 

 [20]
 

 . This interpretation also accords with the Tenth Circuit’s decision in
 
 United States v. Sanders,
 
 928 F.2d 940 (10th Cir.),
 
 cert. denied,
 
 502 U.S. 845, 112 S.Ct. 142, 116 L.Ed.2d 109 (1991), in which the court overturned the defendant's convictions for money laundering in connection with the purchase of two cars. Although the defendant titled the cars in his wife's and daughter’s names, the court found that his conspicuous involvement in the purchase negotiations and subsequent conspicuous use of the cars undercut the argument that the transactions were designed to conceal defendant's association with them. According to the court, “|T|he purpose of the money laundering statute is to reach commercial transactions intended (at least in part) to disguise
 
 the relationship
 
 of the item purchased with the person providing the proceeds.”
 
 Id.
 
 at 946. Thus, the transactions in
 
 Sanders
 
 ”differ[ed] from what could be described as a 'lypical money laundering transaction' in the Sanderses' failure to use a third party to make the car purchases and thereby conceal the buyers' identities.”
 
 Id.
 
 (citation omitted). The Tenth Circuit reiterated this interpretation of
 
 Sanders
 
 in
 
 United States v. Edgmon,
 
 952 F.2d 1206 (10th Cir.1991),
 
 cert. denied,
 
 - U.S. -, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992), in which the court upheld the defendant’s conviction for money laundering when the evidence showed that, although the defendant provided the money to finance the transactions, it was his father who negotiated and paid for the assets, which were then used as collateral for a loan that was ultimately remitted to the defendant.
 
 Id.
 
 at 1210-11. Distinguishing
 
 Sanders,
 
 the court stated, “[I]n holding that the defendants in
 
 Sanders
 
 did not violate § 1956, we emphasized that no third parties were involved and no effort was made to conceal the identity of the defendants as the purchasers.”
 
 Id.
 
 at 1210 (citation omitted).
 

 [21]
 

 . In
 
 Termini,
 
 however, the court reversed the defendant's conviction for aiding and abetting money laundering because the government's evidence was insufficient to show that the defendant, a route driver who merely collected the funds for the defendants who actually masterminded the illegal gambling scheme, had the requisite intent to aid and abet the illegal scheme.
 
 Termini,
 
 992 F.2d at 881-82.
 

 [22]
 

 . In
 
 Lovett,
 
 however, the court reversed the defendant's convictions with respect to two counts charging him with money laundering in connection with the purchase of a car and a ring using the illegal proceeds; the court found that as to these two transactions the government had shown no more than mere money spending.
 
 Id.
 
 at 1036-37.
 

 [23]
 

 . Indeed, viewed in isolation, many transactions charged as money laundering could not be classified as "unusual” financial transactions. Those who would launder illegal proceeds frequently use cash, personal checks, or cashier’s checks to pay for the assets or make the transfers that are charged as money laundering.
 

 [24]
 

 . We thus reject Willey's implicit argument that there could be no design to conceal because each check charged in the money laundering counts listed its true remitter or clearly indicated the account from which it came. Obviously, with respect to the
 
 immediate
 
 source of the money, this is true, but that is not what the government was seeking to prove. Its argument was that, with respect to each transaction, the
 
 ultimate
 
 source of the funds, i.e., Willey, was concealed.
 

 [25]
 

 . The Lillie Mae Smith Trust was a testamentary trust, set up by an elderly couple, who asked Willey to serve as trustee. Willey had used the same brokerage firm at which Bacon had her account in his capacily as trustee for the Lillie Mae Smith Trust since its inception in 1983. The record does not reveal for whose benefit the trust was established.
 

 [26]
 

 . Although the sale contemplated in count 30 was not consummated, this factor is not relevant to our analysis of the design element. The charged transaction is the purchase of the cashier's check, and the relevant inquiry concerns the defendant’s state of mind at the time he purchased the check.
 

 [27]
 

 . In
 
 Garcia-Emanuel,
 
 the charged conduct was the purchase of a horse by the defendant's wife, but in the defendant’s own name, with a cashier's check drawn on the defendant and his wife’s joint checking account.
 
 Garcia-Emanuel,
 
 14 F.3d at 1478. The evidence showed that, prior to the issuance of the cashier's check, $23,-000 in currency had been deposited to the account in amounts small enough to avoid triggering the bank’s duty to report currency deposits of more than $10,000.
 
 Id.
 
 The court noted that this attempt to avoid a transaction reporting requirement was prosecutable under 18 U.S.C. § 1956(a)(l)(B)(2), but the government had not proceeded under this more straightforward theory.
 
 Id.
 
 Nevertheless, although "[t]he inference under this theory [that the conduct constituted money laundering in violation of § 1956(a)(l)(B)(i)], that the design to conceal in the first transaction (the purchase of the cashier's check) can be imputed to the second (the purchase of the horse), is considerably weaker,” the court found that "this is evidence of a design to conceal” and reinstated the conviction.
 
 Id.
 

 [28]
 

 . We recognize that the court in
 
 United States v. Peery,
 
 977 F.2d 1230 (8th Cir.1992),
 
 cert. denied, -
 
 U.S. -, 113 S.Ct. 1354, 122 L.Ed.2d 734 (1993), affirmed the defendant’s conviction for money laundering when he had merely moved the illegal proceeds through accounts titled in his own name. We find that case distinguishable, however. The
 
 Peery
 
 court seems to have been willing to infer that the design to conceal in the initial transfer to the defendant’s personal account of money that rightfully belonged to the defendant's employer carried through to the subsequent transfer between the defendant’s own accounts.
 
 See id.
 
 at 1234 & n. 3. Moreover, the evidence in
 
 Peery
 
 showed that, having made the transfers between his personal accounts, the defendant then purchased cashier’s checks from the account to make car payments and put a down payment on a house.
 
 Id.
 
 at 1234. The court found that this showed that the defendant “did more than merely transfer funds from one personal account to another personal account."
 
 Id.
 
 In contrast, the transfer charged here was much more attenuated from the original illegality and so far removed from any subsequent potentially concealing act that we must conclude that this was no more than a transfer between two personal accounts in the same name, a situation that
 
 Peery
 
 itself implicitly recognizes is insufficient to support an inference of a design to conceal.
 
 Id.
 

 [29]
 

 . The government points out that this Court distinguished
 
 Benson
 
 in
 
 United States v. Moore,
 
 997 F.2d 55 (5th Cir.1993). The Court noted that the testimony in
 
 Benson
 
 was objectionable, at least in part, because the IRS agent had testified as to the defendant’s state of mind, which is prohibited by Rule 704.
 
 Id.
 
 at 58;
 
 see Benson,
 
 941 F.2d at 604 ("Nothing in the record indicates Cantzler had any particular knowledge of Social Security law, or any other expertise that would give him any special insight into the mind of a person trying to cheat the Social Security Administration.”). The Court went on:
 

 "The more pertinent authority is
 
 United States v. Dotson,
 
 817 F.2d 1127 (5th Cir.),
 
 aff'd in pertinent part on reh’g,
 
 821 F.2d 1034 (1987). In
 
 Dotson,
 
 we held that it was permissible for the IRS expert to summarize and analyze the facts indicating willful tax evasion so long as he did not ‘directly embrace the ultimate question of whether [the defendant] did in fact intend to evade income taxes.’
 
 Id.
 
 at 1132.”
 
 Moore,
 
 997 F.2d at 58-59 (alteration in Moore).
 

 Stone's testimony did not violate the limitation of Rule 704(b). Her testimony was that the transactions "concealed” the source of the funds,
 
 not
 
 that they were “designed to conceal,” which is the ultimate issue in this case.
 

 [30]
 

 . In the district court below and now on appeal, the government contends that Willey does not have standing to contest the search of the Richards Road property because he did not enjoy a legitimate expectation of privacy in the property. This seems a curious argument for the government to make, given that in every other aspect of the case, the government argues that Willey did have a real and substantial interest in the Richards Road property. The district court did not err in finding that Willey had standing. Shadylane Farms had purchased the property only a week before, and on the day of the search, Willey and Bacon were in the process of moving their belongings from the Sunset Lake Road house to Richards Road. This is more than sufficient to give Willey a legitimate expectation of privacy in the Richards Road property.
 

 [31]
 

 . In the alternative, Willey contends that the agents exhibited a "flagrant disregard” for the scope of the warrant and that therefore all the evidence recovered from the search should be suppressed. This Court has not adopted the flagrant disregard exception to severability.
 
 United States v. Khalid,
 
 No. 93-2345 (5th Cir. Nov. 14, 1994) (unpublished) at 9 n. 10, 41 F.3d 661. In any event, the evidence does not compel the conclusion that there was a flagrant disregard.
 

 [32]
 

 . Willey directs this court to the Second Circuit opinion in
 
 United States v. Skinner,
 
 946 F.2d 176 (2d Cir.1991), in which the court remanded a sentence imposed for violations of 18 U.S.C. § 1956(a)(1)(A)© for reconsideration when the charged conduct, although falling within the proscription of the statute, was so
 
 de minimis
 
 as to he outside the contemplation of the Sentencing Commission in fashioning the money laundering guidelines.
 
 Id.
 
 at 179-80. In subsequent cases, however, the Second Circuit has clarified that
 
 Skinner
 
 represents an exception to the general rule that a refusal to depart downward is not subject to appellate review and only applies “when a sentencing court mistakenly concludes that it lacks the legal authority to grant a downward departure.”
 
 United States v. Piervinanzi,
 
 23 F.3d 670, 685 (2d Cir.),
 
 cert.
 
 denied, - U.S. -, 115 S.Ct. 259, 130 L.Ed.2d 179,
 
 and cert.
 
 denied, - U.S. -, 115 S.Ct. 267, 130 L.Ed.2d 185 (1994). Willey does not suggest and the record does not reflect that the district court felt itself legally constrained to deny his request for a downward departure.
 

 [33]
 

 . Of course, it is a ground to deny a discharge in the first instance if the debtor is shown to have concealed property, either before or after bankruptcy, with the intent to hinder, delay, or defraud creditors. 11 U.S.C. § 727(a)(2). In addition, a discharge may be revoked if it is proved that the debtor obtained the discharge through fraud and the creditor or trustee did not learn about the fraud until after the discharge had been granted.
 
 Id.
 
 § 727(d)(1). The request for revocation, however, must be made within one year after the date the discharge is granted.
 
 Id.
 
 § 727(e)(1). There is no evidence in the record indicating that such a revocation was either sought or granted in this case.
 

 [34]
 

 . The government argued at sentencing that, in having the commissions paid over to Shadylane Farms rather than himself, Willey avoided significant tax consequences. Willey was not charged with tax evasion or filing false tax returns, however.